Noelle M. Reed
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
Tel: (713) 655-5122
Fax: (713) 483- 9122
Email: Noelle.Reed@Skadden.com
*Attorneys for Plaintiff*

JUDGE RAKOFF





UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

ARCHER WELL COMPANY, INC.,                              :
                                                        :
                              Plaintiff,                :   ECF Case
                                                        :
                                                        :   12 cv
             -- against --                              :
                                                        :   **COMPLAINT**
GW Holdings I LLC and                                   :
Wexford Capital LP,                                     :   **JURY DEMAND**
                              Defendants.               :
                                                        :
                                                        :

-------------------------------------------------------- X

Plaintiff Archer Well Company, Inc. ("Archer"), by its attorneys, Skadden, Arps, Slate,

Meagher & Flom LLP, for its complaint against defendants GW Holdings I LLC ("GW

Holdings") and Wexford Capital, LP ("Wexford"), alleges as follows:

### Nature of the Action

1.      This is a breach of contract action seeking compensatory damages for GW

Holdings' breaches of representations, warranties, and covenants made in a Purchase Agreement

between Plaintiff Archer and GW Holdings, a subsidiary of Wexford, dated July 31, 2011, as

amended on August 22, 2011 (together, the "Purchase Agreement"), for the sale of pressure

control, directional drilling, and pressure pumping services companies, collectively referred to as

Great White.  The five purchased Great White companies are:  Great White Pressure Pumping

LLC, Great White Pressure Control LLC, Great White Directional Services LLC, Diamondback-Directional Drilling LLC and Acid, Inc. (together, "Great White" or "Purchased Companies").

2.      In the Purchase Agreement, GW Holdings made certain representations and warranties to Archer about the Great White businesses, including:  (1) that it had not received written communication from identified customers or suppliers of any intention or threat to terminate or materially reduce purchases from, supplies to or sales of behalf of, Great White, and that no such action was being considered; (2) that all operating equipment of the Purchased Companies was in good operating condition in accordance with industry practice, excepting ordinary wear and tear; and (3) that there had been no material change, development, condition, effect, event, or occurrence that was materially adverse to assets, properties, financial condition, or results of operations of Great White.  GW Holdings also made a covenant in the Purchase Agreement that it would use its reasonable best efforts to preserve, maintain, and protect Great White's business, but failed to do so, causing significant harm to Archer.

3.      After the transaction closed, Archer learned that these representations and warranties were false and that GW Holdings had breached its covenant to preserve, maintain, and protect Great White's business.  As a result of GW Holdings' breaches of the Purchase Agreement, Archer suffered damages in excess of $40 million.

4.      In this lawsuit, Archer seeks damages for GW Holdings' breaches of the representations, warranties, and covenants in the Purchase Agreement, including indemnification for Archer's losses.

## The Parties, Jurisdiction, Venue, and Choice of Law

5.      Archer is a corporation organized under the laws of the State of Texas with its principal place of business in Houston, Texas.

6.     GW Holdings is a Delaware limited liability company with its principal place of business in Connecticut. Upon information and belief, no member of GW Holdings is a resident of Texas.

7.     Wexford is a Delaware limited liability company with its principal place of business in Connecticut. Upon information and belief, no partner of Wexford is a resident of Texas.

8.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of costs and interest.

9.     Venue is proper in this Court pursuant to 28 USC § 1391 and because the parties consented to the jurisdiction of the "United States District Court for the Southern District of New York or any New York court sitting in New York county." By consent, New York law governs the interpretation and construction of the agreements described herein.

<u>**Background**</u>

**A.     Archer and GW Holdings Enter into the Purchase Agreement**

10.    Archer is a global oilfield service provider specializing in drilling services and well services. It employs over 8,500 people unified by a single purpose:  to deliver better wells that help its customers produce more oil and gas.

11.    Archer was formed in 2011, through the merger of Seawell and Allis-Chalmers Energy, and the acquisition of several complementary businesses.

12.    On August 24, 2011, Archer purchased a number of companies from Defendant GW Holdings, including Great White Pressure Pumping LLC, Great White Pressure Control

LLC, Great White Directional Services LLC, Diamondback-Directional Drilling LLC and Acid, Inc., for a total purchase price of approximately $630,000,000.00.

13.     GW Holdings is a subsidiary of Wexford and was formed specifically for the sale of Great White to Archer.  Wexford holds successor liability for GW Holdings.

14.     The companies that make up Great White provide pressure control, directional drilling, and pressure pumping services.  Great White's operations are primarily focused on drilling and completing U.S. onshore unconventional resource plays with locations in many of the basins with horizontal drilling activity, primarily with an oil and liquids focus.

**B.     GW Holdings' Representations, Warranties, and Covenants  in the Purchase Agreement**

**1.     GW Holdings' Representations and Warranties About Great White's Top Ten Customers**

15.     In Schedule 3.19 of the Purchase Agreement, GW Holdings identified the 2009 and 2010 top ten customers of Great White, including Unit Petroleum, Sandridge, and Windsor.

16.     In Section 3.19 of the Purchase Agreement, GW Holdings represented:

Schedule 3.19 of the Disclosure Schedules sets forth a complete and accurate list of the names of the Purchased Companies' (a) ten largest customers for each of the two most recent fiscal years, showing the approximate aggregate total revenues in dollars from each such customer during each such period, and (b) ten largest suppliers for each of the two most recent fiscal years, showing the approximate aggregate total purchases in dollars by the Purchased Companies from each such supplier during each such period. (i) No Seller Party has received any written communication from any customer or supplier named on Schedule 3.19 of the Disclosure Schedules of any intention or threat to terminate or materially reduce purchases from, supplies to or sales on behalf of any Purchased Company and, (ii) to Seller's Knowledge, no such action is being considered.

17.     These representations and warranties were first made on July 31, 2011, the date of the Purchase Agreement, and then again on August 22, 2011, the date of the closing of the purchase of Great White ("Closing").

18.    Unit Petroleum.   On August 1, 2011, Great White Pressure Pumping LLC ("GWPP"), received a letter from Unit Petroleum terminating the services being provided to Unit Petroleum by GWPP under a November 22, 2010 Pricing Agreement between the two parties. Unit Petroleum was one of the customers named on Schedule 3.19 of the Disclosure Schedules to the Purchase Agreement.  Moreover, several members of management of GWPP had previously received communications from Unit Petroleum in June and July of 2011 indicating Unit Petroleum's overall dissatisfaction with the services being provided by GWPP.   These communications establish that GW Holdings knew that Unit Petroleum was planning to terminate its relationship with GWPP even before the August 1, 2011 letter in which Unit Petroleum actually terminated its relationship with Great White.

19.    As a result, the representations in Section 3.19(i) of the Purchase Agreement were false with respect to Unit Petroleum at Closing and the representations in Section 3.19(ii) of the Purchase Agreement were false with respect to Unit Petroleum both as of the date of the Purchase Agreement and at Closing.

20.    Archer learned about the Unit Petroleum termination letter after the transaction with Great White closed.

21.    Sandridge.   The representations and warranties made in Section 3.19 of the Purchase Agreement were also false as to Sandridge, another Great White top-ten customer.

22.    In late April 2011, one Sandridge representative sent an email to GWPP describing a GWPP job as "the worst job he has been on." As a result of persistent service problems, Sandridge refused to pay significant portions of many of the invoices from GWPP in the months leading up to the Closing, and GWPP management knew that Sandridge would likely terminate its relationship with GWPP.

23.    Specifically, on June 7, 2011, in response to a dispute with Sandridge over charges relating to GWPP delays on one job, Will Haley (the president of GWPP at the time) commented that, "we need to start thinking about customers to displace Sandridge."

24.    The relationship with Sandridge continued to deteriorate throughout the summer of 2011.  On August 3, 2011, Barry Shadid at GWPP noted to Haley that GWPP was "on a very short leash" with Sandridge to improve overall job quality, minimize equipment and staffing issues and resolve other issues created by job delays, and that GWPP was "hanging on to this account by a thread."  On September 7, 2011, Sandridge terminated its relationship with GWPP.

25.    In the Purchase Agreement, GW Holdings disclosed only that Sandridge "did not accept price increase, and this may result in [sic] reduction in purchases."  GW Holdings did not disclose the history of Sandridge's dissatisfaction with the quality of GWPP's work and equipment.

26.    These communications among GWPP management, together with the subsequent termination of services by Sandridge after Closing, establish that GW Holdings knew that Sandridge was likely to terminate its relationship with GWPP.  In addition, the repeated disputes over GWPP invoices relating to poor job performance and delays shows that Sandridge terminated GWPP's services due to poor service quality, and not in response to future price increases as stated on Schedule 3.19 of the Disclosure Schedules to the Purchase Agreement.

27.    As a result, Section 3.19(ii) of the Purchase Agreement was false with respect to Sandridge both as of the date of the Purchase Agreement and at Closing.

28.    Archer learned about Sandridge's likely termination after the transaction with Great White closed.

29.     <u>Windsor</u>.  Windsor was another top-ten GWPP customer that expressed serious dissatisfaction with GWPP's performance during 2011.  Windsor terminated its relationship with GWPP days before the Closing.

30.     After the Closing, Archer executives approached certain senior officers of Windsor about GWPP continuing to provide services to Windsor and were told that, given GWPP's extremely poor service quality in the past, Windsor had no desire to use GWPP services now that Windsor's parent company, Wexford, no longer pressured Windsor to use GWPP.

31.     The fact that Windsor resisted using GWPP due to service quality issues, together with the fact that Wexford controlled both Windsor and GWPP during the period prior to Closing and at the time of Windsor's termination, demonstrates that GW Holdings had knowledge prior to Closing that Windsor intended to terminate its relationship with GWPP.

32.     In fact, even before the execution of the Purchase Agreement, the president of Great White acknowledged the strained relationship between the two companies in internal communications and noted to Wexford that GWPP had become "officially divorced" from Windsor.

33.     As a result of the foregoing, the provisions of Section 3.19(ii) of the Purchase Agreement were false with respect to Windsor both as of the date of the Purchase Agreement and at Closing.

34.     Archer learned about the Windsor termination after the transaction with Great White closed.

7

**2.    GW Holdings' Representations and Warranties About Great White's Equipment**

35.    In Section 3.28 of the Purchase Agreement, GW Holdings represented, in pertinent part, that: "All operating equipment of the Purchased Companies is in good operating condition in accordance with industry practice, ordinary wear and tear excepted."

36.    This representation and warranty was first made on July 31, 2011, the date of the purchase Agreement, and then again on August 22, 2011, the date of the closing of the purchase of Great White.

37.    This representation was false both as of the date of the Purchase Agreement and as of Closing.

38.    From early 2011 through the Closing, a significant amount of Great White's equipment, in particular the pumps, blenders, related parts and associated software provided by Serva, an affiliate of Wexford, suffered repeated, material failures.  This equipment was not in good operating condition in accordance with industry practice and was widely acknowledged by both Great White customers and GWPP management to be defective.

39.    One GWPP employee commented that "we have not received anything from Serva that did not need something done to it," and that the equipment was "a mess." The equipment was similarly described by Unit Petroleum as being "defective" and "unpredictable."

40.    At one point in May 2011, the GWPP team compiled a list of Serva equipment problems that contained over one hundred separate issues that needed to be addressed.

41.    In addition, the equipment was frequently provided with incorrect specifications for jobs.  Senior executives of Great White acknowledged that, despite the ongoing problems with Serva, there was tremendous pressure to continue using Serva equipment because Serva was a portfolio company of Wexford.

8

42.     The condition of the equipment deteriorated even further as a result of abuse and substandard maintenance. In an internal email on July 24, 2011, one GWPP supervisor projected that "this fleet is going to be junk just from crew abuse." These equipment problems contributed to many of the disputes with, and subsequent loss of business from, Unit Petroleum, Sandridge, and Windsor.

43.     As a result of the foregoing, the representations in Section 3.28 of the Purchase Agreement were false both as of the date of the Purchase Agreement and at Closing.

### 3.     GW Holdings' Representations and Warranties About Material Adverse Effects

44.     In Section 3.20 of the Purchase Agreement, GW Holdings represented, in pertinent part, that: "since December 31, 2010 there has not been or occurred: (a) a Material Adverse Effect." A "Material Adverse Effect" is defined as "any change, development, condition, effect, event or occurrence that is materially adverse to the assets, properties, financial condition or results of operations of the Purchased Companies, taken as a whole."

45.     In fact, from January 1, 2011, through Closing, several customers contacted GWPP to complain that GWPP teams were undertrained and unprofessional.   Internal communications indicate that some GWPP field teams actively tried to sabotage jobs, and even the GWPP supervisors opined that the best course of action would be to shut down and retrain "every position" from the ground up. Senior executives of Great White also suggested that the entire organizational structure of GWPP had become severely flawed.

46.     GWPP also lost key maintenance personnel during the summer of 2011 and, most significantly, the turnover of GWPP managers was extremely high. Between April 12, 2011 and August 8, 2011, twenty (20) GWPP field supervisors resigned from the company, making the supervision and management of GWPP teams even more tenuous.

47.     On July 31, 2011, the date of execution of the Purchase Agreement, one of the GWPP supervisors commented in an internal email, "I start crying ... knowing how far down this division has gone in a year."

48.     These personnel problems exacerbated the problems caused by GWPP's defective equipment because GWPP did not have adequate skilled employees to manage the worsening performance issues on GWPP's jobs, and these factors together caused irreparable harm to GWPP's customer relationships.

49.     By Closing, the deteriorating condition of the GWPP business, which was projected to constitute over half of the total revenues and EBITDA of the business of the Purchased Companies during the end of 2011 and 2012, had caused a material adverse effect on the business of the Purchased Companies as a whole.

50.     As a result of the foregoing, Section 3.20 of the Purchase Agreement was false both as of the date of the Purchase Agreement and at Closing, because the assets and financial condition of GWPP deteriorated so significantly from January 1, 2011 to August 22, 2011, that it had a material adverse effect on the Purchased Companies as a whole.

## 4.     GW Holdings' Covenants Regarding the Maintenance of Great White's Business

51.     In Section 5.4 of the Purchase Agreement, GW Holdings represented, in pertinent part, that:

> during the period from the date hereof until ... the Closing ... Seller shall use its reasonable best efforts to, and shall cause the Purchased Companies to, and each Purchased Company shall ... (i) preserve, maintain and protect the material assets, properties and rights of the Purchased Companies, [and] .... (vii) use all commercially reasonable efforts to maintain and preserve its present business organization in full force and effect, retain its present employees who are in good standing and maintain its relationships with its employees, agents, distributors, licensees, suppliers and customers who are material to the businesses of the Purchased Companies taken as a whole.

10

52.     As set forth above, during the period between the signing of the Purchase Agreement and Closing, GW Holdings failed to cause GWPP to adequately preserve, maintain and protect its equipment, and to use all commercially reasonable efforts to retain its employees, and maintain its relationships with its employees and customers who were material to the business, including Unit Petroleum, Sandridge and Windsor.

C.     **GW Holdings' Indemnification Obligations Under the Purchase Agreement**

53.     The Purchase Agreement sets forth GW Holdings' indemnification obligations for breaches of the representations, warranties, and covenants set forth in the Purchase Agreement.

54.     Section 9.1 of the Purchase Agreement provides, in pertinent part, that "The representations and warranties contained in [the Purchase Agreement] shall survive the Closing and will continue in full force and effect for a period of eighteen (18) months after the Closing....."

55.     Section 9.2 of the Purchase Agreement provides, in pertinent part, that GW Holdings "shall indemnify and hold harmless [Archer] and its Affiliates (including, after the Closing, the Purchased Companies) and their respective officers, directors, employees, agents, successors and assigns ... from and against all Losses that [Archer] actually incur[s] arising from or out of or related to: ... (ii) any inaccuracy or breach of any representation or warranty of any Seller Party in this Agreement as of the Closing Date ... [and] (iii) any breach of, or failure to perform or comply with, any covenant or agreement of any Seller Party contained in this Agreement or any Ancillary Agreement."

56.     All conditions precedent have been satisfied.  Archer has complied with the procedural provisions in the Purchase Agreement for seeking indemnification.

11

57.     The Purchase Agreement states that when making a claim for indemnification under Section 9.2, the indemnified party, *i.e.* Archer, shall provide GW Holdings with "written notice describing in reasonable detail (based on the information then reasonably available to [Archer]) the nature of such claim, demand or proceeding, the amount or estimated amount sought thereunder if known … [and] any other remedy sought thereunder."

58.     The Purchase Agreement also provides that the party seeking indemnification "shall deliver to the Indemnifying Party copies of all material written, photographic, or otherwise readily reproducible evidence of any claim which is in the indemnified Party's possession."

59.     The Purchase Agreement also makes clear that "the failure of the Indemnified Party to give a timely Claim Notice or provide documents or other evidence as provided herein shall not relieve the Indemnifying Party of its respective indemnification obligations under this Agreement except to the extent that the Indemnifying Party is prejudiced as a result of such failure to give timely notice or provide documents."

60.     The Purchase Agreement also states that "Prior to the eighteen month anniversary of the Closing, Buyer shall communicate to Seller, on a monthly basis, those New Claims of which Buyer shall have become aware; provided, however, that the failure to communicate any such New Claim shall not release Seller from any of its obligations under this Article IX except to the extent that Seller is prejudiced by such failure."

61.     On August 3, 2012, in compliance with the terms of the Purchase Agreement, Archer sent to Wexford a detailed demand for indemnification, including documents supporting the demand.  Wexford responded on August 10, 2012, denying any liability.

### D.     The Indemnity Escrow Agreement

62.     As part of the Purchase Agreement, Archer, GW Holdings, and The Bank of New York Mellon, entered into an Indemnity Escrow Agreement (the "Escrow Agreement"), dated August 24, 2011.

63.     Pursuant to the Escrow Agreement, Archer deposited into escrow $31,450,000.

64.     The escrow agent agreed not to release the escrow funds if given timely written notice that Archer was seeking an indemnification claim against GW Holdings. Archer gave such written notice to the escrow agent on August 3, 2011.

65.     Therefore, pursuant to the Escrow Agreement, the escrow agent will not release the escrow funds unless (1) Archer and GW Holdings instruct it to do so, or (2) the escrow agent receives a final, non-appealable judgment, order, or decision of a court of competent jurisdiction which directs the payment of all or any part of the escrow funds.

### FIRST CAUSE OF ACTION AGAINST GW HOLDINGS AND WEXFORD
#### (Breach of Representations and Warranties Relating to Great White's Customers)

66.     Archer incorporates by reference the allegations contained in the above paragraphs as if set forth in full herein.

67.     Archer and GW Holdings are parties to the Purchase Agreement.

68.     In the Purchase Agreement, GW Holdings represented and warranted that it had no knowledge, except as previously or otherwise known to Archer, that any of the top ten customers of Great White threatened to terminate or materially reduced purchases from, supplies to, or sales on behalf of Great White, or considered doing so.

69.     GW Holdings breached these representations and warranties by failing to timely disclose its knowledge that Unit Petroleum, Sandridge, Windsor, and potentially other Great

White customers had threatened or considered terminating or materially reducing purchases from, supplies to, or sales on behalf of Great White.

70.     GW Holdings' breach of the Purchase Agreement has caused Archer substantial damages in an amount not yet fully determined, but believed to be in the tens of millions of dollars.

### SECOND CAUSE OF ACTION AGAINST GW HOLDINGS AND WEXFORD
#### (Breach of Representations and Warranties Relating to Great White's Equipment)

71.     Archer incorporates by reference the allegations contained in the above paragraphs as if set forth in full herein.

72.     Archer and GW Holdings are parties to the Purchase Agreement.

73.     In the Purchase Agreement, GW Holdings represented and warranted that Great White's equipment was in good operating condition in accordance with industry practice, ordinary wear and tear excepted.

74.     GW Holdings breached this representation and warranty because, in fact, Great White's equipment, including the pumps, blenders, related parts, and associated software provided by Serva, an affiliate of Wexford, suffered repeated, material failures and has been subjected to abuse and improper maintenance by Great White crews and employees.

75.     GW Holdings' breach of the Purchase Agreement caused Archer substantial damages in an amount not yet fully determined, but believed to be in the tens of millions of dollars.

### THIRD CAUSE OF ACTION AGAINST GW HOLDINGS AND WEXFORD
#### (Breach of Representations and Warranties Relating to the Absence of Changes)

76.     Archer incorporates by reference the allegations contained in the above paragraphs as if set forth in full herein.

14

77.    Archer and GW Holdings are parties to the Purchase Agreement.

78.    In the Purchase Agreement, GW Holdings represented and warranted that there had not been a material adverse effect on Great White's business between December 31, 2010, and the date of the closing, August 22, 2011.

79.    GW Holdings breached this representation and warranty because, in addition to the customer and equipment issues described in the paragraphs above, the departure and subsequent shortage of qualified GWPP personnel resulted in inadequately trained and ineffective teams working on Great White's pressure pumping jobs.

80.    GW Holdings' breach of the Purchase Agreement caused Archer substantial damages in an amount not yet fully determined, but believed to be in the tens of millions of dollars.

### FOURTH CAUSE OF ACTION AGAINST GW HOLDINGS AND WEXFORD
### (Breach of Covenants Relating to the Maintenance of Great White's Business)

81.    In the Purchase Agreement, GW Holdings made certain covenants about the maintenance of the Great White companies.

82.    GW Holdings breached those covenants by failing to cause the Purchased Companies to adequately preserve, maintain, and protect its equipment, and to use all commercially reasonable efforts to retain its employees, and maintain its relationships with its employees and customers who were material to the business, including Unit Petroleum, Sandridge, and Windsor.

83.    GW Holdings' breach of the Purchase Agreement has caused Archer substantial damages in an amount not yet fully determined, but believed to be in the tens of millions of dollars.

**WHEREFORE**, Archer respectfully prays that this Court enter judgment in favor of Archer and against GW Holdings and Wexford:

A.   Directing the payment to Archer of all of the escrow funds; and

B.   Awarding Archer its costs, interest, attorneys' fees, and such other and further relief as the Court shall deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL OF ALL CLAIMS.**

Dated: Houston, Texas
      September 6, 2012

Noelle M. Reed
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
Tel: (713) 655-5122
Fax: (713) 483- 9122
Email: Noelle.Reed@Skadden.com

ATTORNEYS   FOR   PLAINTIFF   ARCHER   WELL
COMPANY, INC.

17