# BOUTHILLETTE DECL.

# EXHIBIT B-1

EXECUTION VERSION

**PURCHASE AGREEMENT**
by and among

GW HOLDINGS I LLC,

as **SELLER**,

ACID, INC.,

GREAT WHITE PRESSURE PUMPING LLC,

GREAT WHITE PRESSURE CONTROL LLC,

GREAT WHITE DIRECTIONAL SERVICES LLC, AND

DIAMONDBACK-DIRECTIONAL DRILLING LLC

as the **PURCHASED COMPANIES**, and

ARCHER WELL COMPANY INC.,

as **BUYER**

Dated as of July 31, 2011

Confidential

## TABLE OF CONTENTS

Page

### ARTICLE I

### DEFINITIONS; INTERPRETATION

| | | |
|---|---|---|
| Section 1.1 | Definitions Generally | 1 |
| Section 1.2 | Interpretation Generally | 1 |

### ARTICLE II

### THE TRANSACTION

| | | |
|---|---|---|
| Section 2.1 | Purchase | 2 |
| Section 2.2 | Purchase Price | 3 |
| Section 2.3 | Closing Date Payment Amount | 3 |
| Section 2.4 | Closing | 4 |
| Section 2.5 | Deliveries by Seller | 4 |
| Section 2.6 | Deliveries by Buyer | 5 |
| Section 2.7 | Post-Closing Purchase Price Adjustment | 5 |

### ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF SELLER

| | | |
|---|---|---|
| Section 3.1 | Organization and Qualification | 7 |
| Section 3.2 | Corporate Authorization | 8 |
| Section 3.3 | Binding Effect | 8 |
| Section 3.4 | Regulatory Approvals and Non-Governmental Consents | 9 |
| Section 3.5 | Non-Contravention | 10 |
| Section 3.6 | Assets; Capitalization; Equity Interests | 10 |
| Section 3.7 | Financial Statements; No Undisclosed Liabilities | 11 |
| Section 3.8 | Litigation and Claims | 12 |
| Section 3.9 | Compliance with Law; Regulatory Matters | 13 |
| Section 3.10 | Intellectual Property | 13 |
| Section 3.11 | Employee Benefits | 14 |
| Section 3.12 | Employment Matters | 16 |
| Section 3.13 | Material Contracts | 17 |
| Section 3.14 | Real Property | 19 |
| Section 3.15 | Taxes | 20 |
| Section 3.16 | Insurance | 22 |
| Section 3.17 | Finders' Fees | 22 |
| Section 3.18 | Environmental Compliance | 22 |
| Section 3.19 | Customers, Suppliers and Distributors | 23 |

i

**Section 3.20**    Absence of Certain Changes or Events.................................................23
**Section 3.21**    Internal Controls...............................................................................23
**Section 3.22**    Registration Statement......................................................................24
**Section 3.23**    Certain Business Practices.................................................................24
**Section 3.24**    Export Controls and Trade Sanctions ...............................................24
**Section 3.25**    Accounts Receivable.........................................................................25
**Section 3.26**    No Affiliate Transactions..................................................................25
**Section 3.27**    Cash Management.............................................................................25
**Section 3.28**    Equipment........................................................................................25
**Section 3.29**    Projections.......................................................................................25
**Section 3.30**    Limitations on Representations and Warranties .................................26

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF BUYER

**Section 4.1**    Existence; Organization; Qualification..............................................26
**Section 4.2**    Corporate Authorization...................................................................26
**Section 4.3**    Binding Effect..................................................................................26
**Section 4.4**    Regulatory Approvals and Non-Governmental Consents....................27
**Section 4.5**    Non-Contravention...........................................................................27
**Section 4.6**    Finders' Fees...................................................................................27
**Section 4.7**    Litigation and Claims.......................................................................28
**Section 4.8**    Financial Capability.........................................................................28
**Section 4.9**    Investment Purpose..........................................................................28
**Section 4.10**    Limitations on Representations and Warranties .................................28

## ARTICLE V

### COVENANTS

**Section 5.1**    Access and Reports...........................................................................29
**Section 5.2**    Access to Properties.........................................................................29
**Section 5.3**    Efforts to Consummate; Certain Governmental Matters .....................30
**Section 5.4**    Interim Operation Covenants of Seller and the Purchased Companies .................32
**Section 5.5**    Public Disclosure; Confidentiality.....................................................36
**Section 5.6**    Records ...........................................................................................37
**Section 5.7**    Directors' and Officers' Exculpation; Indemnification.......................37
**Section 5.8**    Post-Closing Changing of Names......................................................38
**Section 5.9**    Withdrawal of Registration Statement................................................38
**Section 5.10**    Notifications of Certain Matters .......................................................38
**Section 5.11**    Payment of Indebtedness..................................................................39
**Section 5.12**    Notices to Escrow Agent..................................................................39
**Section 5.13**    Asset Transfers................................................................................39

Confidential

ARCHER-00270507

ARTICLE VI

EMPLOYMENT MATTERS

| | | |
|---|---|---|
| Section 6.1 | Employment | 39 |
| Section 6.2 | Employee Benefits | 40 |
| Section 6.3 | Credit for Service and Benefit Accrual | 40 |
| Section 6.4 | Treatment of Seller Defined Contribution Plans | 40 |
| Section 6.5 | WARN | 41 |
| Section 6.6 | No Amendment | 42 |
| Section 6.7 | Employment Agreements | 42 |

ARTICLE VII

TAX MATTERS

| | | |
|---|---|---|
| Section 7.1 | Tax Returns | 42 |
| Section 7.2 | Tax Indemnification | 43 |
| Section 7.3 | Straddle Periods | 43 |
| Section 7.4 | Transfer Taxes | 43 |
| Section 7.5 | Contest Provisions | 44 |
| Section 7.6 | Buyer's Claiming, Receiving or Using of Refunds and Overpayments | 44 |
| Section 7.7 | Assistance and Cooperation | 45 |
| Section 7.8 | Maintenance of Buyer's Books and Records | 45 |
| Section 7.9 | Purchase Price Allocation | 45 |
| Section 7.10 | Adjustment to Purchase Price | 46 |
| Section 7.11 | Tax Sharing Agreements | 46 |
| Section 7.12 | Section 7.12. Coordination; Survival | 46 |

ARTICLE VIII

CONDITIONS TO CLOSING

| | | |
|---|---|---|
| Section 8.1 | Conditions to Mutual Obligations | 46 |
| Section 8.2 | Conditions to Obligations of Buyer | 47 |
| Section 8.3 | Conditions to Obligations of Seller | 48 |
| Section 8.4 | Certain Pre-Closing Breaches of Seller Parties | 49 |

ARTICLE IX

SURVIVAL; BUYER ACKNOWLEDGMENT; INDEMNIFICATION

| | | |
|---|---|---|
| Section 9.1 | Survival | 50 |
| Section 9.2 | Indemnification Obligations and Procedure | 50 |
| Section 9.3 | Limitations on Seller's Indemnification Obligations | 54 |
| Section 9.4 | Limitation on Buyer's Obligations | 55 |

iii

Confidential

**Section 9.5**   Exclusive Remedy ...................................................................56
**Section 9.6**   Tax Treatment of Indemnity Payments...................................56

ARTICLE X

TERMINATION

**Section 10.1**   Termination...........................................................................56
**Section 10.2**   Effect of Termination............................................................57
**Section 10.3**   Termination Fee ....................................................................58

ARTICLE XI

MISCELLANEOUS

**Section 11.1**   Notices ..................................................................................59
**Section 11.2**   Amendment; Waiver..............................................................60
**Section 11.3**   No Assignment or Benefit to Third Parties............................60
**Section 11.4**   Entire Agreement; Inconsistency ..........................................61
**Section 11.5**   Satisfaction of Obligations....................................................61
**Section 11.6**   Expenses ...............................................................................61
**Section 11.7**   Exhibits; Appendices; Disclosure Schedules........................61
**Section 11.8**   Governing Law; Submission to Jurisdiction; Selection of Forum.........................62
**Section 11.9**   WAIVER OF JURY TRIAL.................................................62
**Section 11.10**  Counterparts ..........................................................................63
**Section 11.11**  Legal Representation .............................................................63
**Section 11.12**  Headings ................................................................................64
**Section 11.13**  Severability ...........................................................................64
**Section 11.14**  Currency.................................................................................64
**Section 11.15**  DAMAGES.............................................................................64

APPENDICES, EXHIBITS AND DISCLOSURE SCHEDULES
APPENDICES
Appendix A          –          Definitions
EXHIBITS
Exhibit A            –          Indemnity Escrow Agreement
Exhibit B            –          Accounting Principles
DISCLOSURE SCHEDULES
Schedule 2.3(a)      –          Credit Facility Indebtedness
Schedule 2.3(d)      –          Post-Closing Affiliate Indebtedness
Schedule 2.3(e)      –          Capital Lease Obligations
Schedule 2.3(f)      –          GE Capital Debt
Schedule 2.5(g)      –          Officers and Directors
Schedule 3.1(a)      –          Qualifications and Licenses
Schedule 3.4(a)      –          Seller Regulatory Approvals

iv

Confidential

Schedule 3.4(b)        —    Seller Non-Governmental Consents
Schedule 3.5           —    Seller Non-Contravention
Schedule 3.6(a)(i)     —    Title to Company Assets
Schedule 3.6(a)(ii)    —    Register of Company Assets
Schedule 3.6(b)        —    Transferred Interests
Schedule 3.6(c)        —    Capitalization; Ownership of Equity Interests
Schedule 3.6(d)        —    Agreements with Respect to Equity Interests
Schedule 3.6(e)        —    Indebtedness
Schedule 3.8(a)        —    Litigation and Claims
Schedule 3.8(b)(i)     —    Seller Released Liabilities
Schedule 3.8(b)(ii)    —    Excluded Contracts
Schedule 3.9           —    Compliance with Laws; Regulatory Matters
Schedule 3.10(a)       —    Company Intellectual Property Rights
Schedule 3.10(b)       —    Intellectual Property Rights Owned by Seller
Schedule 3.10(c)       —    Intellectual Property Infringement
Schedule 3.11(a)       —    Benefit Plans and Employment Agreements
Schedule 3.11(d)       —    Benefit Plan Contributions
Schedule 3.11(h)       —    Seller Employees
Schedule 3.12(c)       —    Compliance with Employment Laws
Schedule 3.12(g)       —    Compensation and Bonuses
Schedule 3.13(a)       —    Material Contracts
Schedule 3.14(a)       —    Owned and Leased Real Property
Schedule 3.14(b)       —    Leases, Licenses and Sublicenses
Schedule 3.15          —    Taxes
Schedule 3.16          —    Insurance Policies
Schedule 3.18          —    Environmental Compliance
Schedule 3.19          —    Top Customers, Suppliers and Distributors
Schedule 3.19(a)(ii)   —    Customer Actions
Schedule 3.20          —    Absence of Certain Changes or Events
Schedule 3.23          —    Certain Business Practiuces
Schedule 3.25          —    Accounts Receivable
Schedule 3.29          —    Financial Projections
Schedule 4.4(a)        —    Buyer Regulatory Approvals
Schedule 4.4(b)        —    Buyer Non-Governmental Consents
Schedule 4.5           —    Buyer Non-Contravention
Schedule 5.3(h)        —    Transition Services
Schedule 5.4           —    Interim Operation Covenants of Seller
Schedule 5.7           —    Director and Officer Indemnification
Schedule 5.11          —    Payments of Indebtedness
Schedule 5.13          —    Asset Transfers
Schedule 6.7           —    Employment Agreements
Schedule 8.2(e)        —    Consents
Schedule 8.2(f)        —    Governmental and Regulatory Filings

v

ARCHER-00270510

THIS PURCHASE AGREEMENT, dated as of July 31, 2011 (as it may be amended or supplemented from time to time in accordance with the terms hereof, this "Agreement"), is by and among ARCHER WELL COMPANY INC., a corporation organized under the Laws of the State of Texas ("Buyer"), GW HOLDINGS I LLC, a limited liability company organized under the Laws of the State of Delaware ("Seller"), and each of the Purchased Companies (as defined below). Buyer, Seller and the Purchased Companies are each sometimes referred to herein individually as a "Party" and collectively as the "Parties".

W I T N E S S E T H:

WHEREAS, Seller desires to sell, convey, assign, transfer and deliver ("Transfer") to Buyer all of the issued and outstanding equity interests (the "Transferred Interests") in each of the following entities (each a "Purchased Company" and collectively the "Purchased Companies", and each entity listed in (ii) through (v) a "Purchased LLC" and collectively the "Purchased LLCs"): (i) Acid, Inc., a corporation organized under the Laws of the State of Texas, (ii) Great White Pressure Pumping LLC, a limited liability company organized under the Laws of the State of Delaware, (iii) Great White Pressure Control LLC, a limited liability company organized under the Laws of the State of Oklahoma, (iv) Great White Directional Services LLC, a limited liability company organized under the Laws of the State of Oklahoma, and (v) Diamondback-Directional Drilling LLC, a limited liability company organized under the Laws of the State of Delaware; and

WHEREAS, Buyer desires to purchase and accept ("Purchase") from Seller, all on the terms and subject to the conditions set forth herein, all of the Transferred Interests.

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and undertakings contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

ARTICLE I

DEFINITIONS; INTERPRETATION

**Section 1.1** Definitions Generally. Defined terms in this Agreement and in the Appendices, Exhibits and Disclosure Schedules to this Agreement, which may be identified by the capitalization of the first letter of each principal word thereof, have the meanings assigned to them in Appendix A. Other terms may be defined elsewhere in the text of this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement and the Appendices, Exhibits and Disclosure Schedules hereto.

**Section 1.2** Interpretation Generally. Unless the express context otherwise requires:

Confidential

(a) the words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(b) the terms defined in the singular have a comparable meaning when used in the plural, and vice versa;

(c) references herein to a specific Article, Section, Subsection or Disclosure Schedule shall refer, respectively, to Articles, Sections, Subsections or Disclosure Schedules of this Agreement;

(d) wherever the word "include," "includes," or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation";

(e) references herein to any gender includes the other gender;

(f) the word "or" shall be inclusive and not exclusive (for example, the phrase "A or B" means "A or B or both," not "either A or B but not both"), unless used in conjunction with "either" or the like;

(g) each reference to "days" shall be to calendar days, unless otherwise specified;

(h) each reference to any Contract shall be to such Contract as amended, supplemented, waived or otherwise modified from time to time;

(i) each reference to a Law, statute, regulation or other government rule is to it as amended from time to time and, as applicable, is to corresponding provisions of successor Laws, statutes, regulations or other government rules; and

(j) accounting terms which are not otherwise defined in this Agreement, or any Appendix or Disclosure Schedule hereto, shall have the meanings given to them under GAAP.

ARTICLE II

THE TRANSACTION

**Section 2.1** <u>Purchase</u>. On the terms and subject to the conditions set forth in this Agreement, at the Closing and effective as of 9:00 a.m. Houston, Texas time on the Closing Date, Seller shall Transfer to Buyer, and Buyer shall Purchase from Seller, Seller's entire right, title and interest in and to all of the Transferred Interests free and clear of any Liens.

- 2 -

Confidential

**Section 2.2**   Purchase Price.  The purchase price for the Transferred Interests shall be an amount in Dollars equal to $742,000,000 (the "Base Closing Cash Amount") plus or minus the adjustments thereto in accordance with Section 2.3 or Section 2.7 (as so adjusted, the "Purchase Price").

**Section 2.3**   Closing Date Payment Amount.  On or prior to the first Business Day prior to the Closing Date, the Seller Parties shall cause to be prepared and delivered to Buyer a statement setting forth a good faith estimate of the Net Working Capital Amount (the "Estimated Net Working Capital Amount") and the components thereof determined in accordance with the Accounting Principles.  The amount payable by Buyer to Seller at the Closing shall be an amount (the "Closing Date Payment Amount") in Dollars equal to (i) the Base Closing Cash Amount, *minus* (ii) the amount of undisputed Losses resulting from all uncured Applicable Pre-Closing Breaches pursuant to Section 8.4 *plus* (iii) the amount, if any, by which  the Estimated Net Working Capital Amount exceeds the Reference Working Capital Amount, if any, *minus* (iv) the amount, if any, by which the Reference Working Capital Amount exceeds the Estimated Net Working Capital Amount.  At the Closing, the Closing Date Payment Amount shall be paid by wire transfer in immediately available funds as follows:

(a)    an amount equal to the Closing Date Credit Facility Indebtedness (including, for the avoidance of doubt, all obligations unpaid and outstanding as of Closing under the agreements set forth on Schedule 2.3(a)) shall be paid to one or more accounts of the holders of the Closing Date Credit Facility Indebtedness, if any;

(b)    an amount equal to the Transaction Related Expenses that have not been paid prior to the Closing, and with respect to which one or more of the Purchased Companies has received an invoice no less than two (2) Business Days prior to the Closing Date, as applicable, shall be paid to one or more accounts (of the applicable Persons to whom such payments are required to be made) specified by Seller upon written notice given by Seller to Buyer no less than two (2) Business Days prior to the Closing Date;

(c)    an amount equal to the Indemnity Escrow Amount shall be paid into an escrow account (the "Indemnity Escrow") set up by Buyer and Seller with the terms of the escrow agreement to be executed and delivered by each of Buyer and Seller and the Escrow Agent at Closing in substantially the form attached hereto as Exhibit A (the "Indemnity Escrow Agreement");

(d)    an amount equal to all Affiliate Indebtedness unpaid and outstanding at the Closing (other than, for the avoidance of doubt, any Indebtedness that accrues after the Closing under (i) the capital leases for real estate listed on Schedule 2.3(d), (ii) Indebtedness under the Contracts with Serva Group LLC that are listed on Schedule 2.3(d) and (iii) any other Indebtedness to Serva Group LLC under Contracts entered into after the date of this Agreement in accordance with Section 5.4(b)(xix)) shall be paid to one or more accounts specified by Seller;

- 3 -

Confidential

ARCHER-00270513

(e)     an amount equal to the aggregate amount outstanding at Closing under all capital lease obligations listed on <u>Schedule 2.3(e)</u> shall be paid to one or more accounts of the holders of the outstanding capital lease obligations;

(f)     an amount equal to the aggregate amount outstanding at Closing under the Indebtedness listed on <u>Schedule 2.3(f)</u> shall be paid to one or more accounts of the holders of such Indebtedness; and

(g)     an amount equal to the Closing Date Payment Amount minus the aggregate amounts referred to in the foregoing clauses (a), (b), (c), (d), (e) and (f) shall be paid to an account of Seller or one of its designees, which account shall be specified by Seller upon written notice given by Seller to Buyer no less than two (2) Business Days prior to the Closing Date.

**Section 2.4**     <u>Closing</u>.  The closing of the Transfer and Purchase of the Transferred Interests (the "<u>Closing</u>") shall take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP located at 1000 Louisiana St., Suite 6800, Houston, Texas 77002, at 9:00 a.m. Houston, Texas time, on the second Business Day following the date on which the last of the conditions set forth in <u>Article VIII</u> (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) is satisfied or waived, or at such other place, time and date as the Parties may agree (the "<u>Closing Date</u>"). If all of the conditions to Closing of Buyer or Seller, as applicable, set forth in <u>Article VIII</u> (other than those condition that by their terms are to be satisfied at Closing) have been satisfied, then the other Party may deliver written notice to either Buyer or Seller, as applicable, stating that either (i) all of the conditions to Closing (other than those condition that by their terms are to be satisfied at Closing) have been satisfied or (ii) if any conditions to Closing of such Party delivering such notice remain unsatisfied, that it waives all such unsatisfied conditions, and the Closing Date shall then occur in accordance with the preceding sentence; <u>provided</u>, that the failure to deliver such written notice shall in no way affect the Parties obligations as set forth in the preceding sentence.

**Section 2.5**     <u>Deliveries by Seller</u>.  At the Closing, Seller shall deliver or cause to be delivered to Buyer the following:

(a)     the certificate to be delivered pursuant to <u>Section 8.2(c)</u>;

(b)     a certification, in a form reasonably satisfactory to Buyer that complies with Section 1445(b)(2) of the Code and the Treasury Regulations promulgated thereunder; <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary contained in this Agreement, if Seller fails to deliver such certification, (i) Buyer shall be entitled to proceed with the Closing and withhold any amounts required to be withheld under applicable law as calculated by Buyer in good faith, (ii) Buyer shall not be deemed to be in default of any of its obligations under this Agreement by virtue of having withheld such amount and (iii) the amount so withheld shall be

- 4 -

Confidential

deemed to have been paid to Seller on the date that any amounts not so withheld were paid for all purposes under this Agreement;

(c)    certificates, stock powers and any other necessary documentation duly executed by Seller evidencing the transfer of such Transferred Interests by Seller to Buyer, free and clear of all Liens in accordance with this Agreement;

(d)    a payoff letter from the administrative agent under the Credit Facility regarding the payment in full (other than indemnification obligations that either are not owing or outstanding) of the Closing Date Credit Facility Indebtedness;

(e)    the Supplier Documentation;

(f)    all records required to be delivered pursuant to Section 5.6; and

(g)    written resignations of the officers and directors of the Purchased Companies effective as of Closing set forth on Schedule 2.5(g) of the Disclosure Schedules.

Section 2.6    Deliveries by Buyer.  At the Closing, Buyer shall deliver to Seller (or, in case of clause (b) below, if applicable, as specified in Section 2.3) the following:

(a)    the certificate to be delivered pursuant to Section 8.3(c); and

(b)    the Closing Date Payment Amount, by wire transfer in immediately available funds, in accordance with Section 2.3 to the various accounts referred to in Section 2.3.

Section 2.7    Post-Closing Purchase Price Adjustment.

(a)    Within sixty (60) calendar days after the Closing Date, Buyer shall cause to be prepared and delivered to Seller a statement (the "Net Working Capital Statement") setting forth the Net Working Capital Amount and the components thereof.  The Net Working Capital Statement and the Net Working Capital Amount calculation shall be prepared and calculated in good faith, and in the manner and on a basis consistent with the calculations set forth in Exhibit B (the "Accounting Principles").

(b)    After the NWCS Delivery Date, Seller will have fifteen (15) calendar days to review the Net Working Capital Statement.  Unless Seller delivers written notice (which notice shall include the items and amounts in dispute and supporting documentation related thereto) to Buyer setting forth the specific items disputed by Seller with respect thereto on or prior to the fifteenth (15th) calendar day after the NWCS Delivery Date, Seller will be deemed to have accepted and agreed to the Net Working Capital Statement and such statement (and the calculations contained therein) will be the final, binding and conclusive determination of the Net Working Capital Amount for purposes of this Agreement.  If Seller notifies Buyer of its

- 5 -

ARCHER-00270515

objections to specific items contained in the Net Working Capital Statement (or specific calculations contained therein) within such fifteen (15) calendar day period, Buyer and Seller shall, within thirty (30) calendar days following delivery of such notice by Seller to Buyer (or such longer period as they may mutually agree in writing) (the "Resolution Period"), attempt in good faith to resolve their differences with respect to the disputed items (or calculations) specified in such notice (the "Disputed Items"), and all other items (and all calculations relating thereto) will be final, binding and conclusive. Any resolution by Buyer and Seller during the Resolution Period as to any Disputed Item shall be set forth in writing and will be final, binding and conclusive. "NWCS Delivery Date" means the date on which Seller receives the Net Working Capital Statement; provided, however, that if Seller reasonably requests any information from Buyer with respect to such Net Working Capital Statement within five Business Days of Seller's receipt of such Net Working Capital Statement, then the NWCS Delivery Date shall be the date on which such information is provided to Seller

(c)     If Buyer and Seller do not resolve all of the Disputed Items by the end of the Resolution Period, then all Disputed Items remaining in dispute will be submitted to the Neutral Arbitrator. The Neutral Arbitrator shall act as an arbitrator to determine only those Disputed Items remaining following the Resolution Period, consistent with this Section 2.7, and shall request a statement from Buyer and Seller regarding such Disputed Items. The scope of the disputes to be arbitrated by the Neutral Arbitrator is limited to those items or calculations specifically disputed by Seller, and the Neutral Arbitrator is not to make any other determination. In resolving each Disputed Item, the Neutral Arbitrator shall be bound by the principles set forth in this Section 2.7 and may not assign a value to any Disputed Item greater than the greatest value for such Disputed Item claimed by either Buyer or Seller or less than the lowest value for such Disputed Item claimed by either Buyer or Seller. The Parties further agree that the adjustment contemplated by this Section 2.7 is intended to show the change between the Estimated Net Working Capital Amount and the Net Working Capital Amount, and that such change can only be measured if each calculation is done in a manner consistent with the Accounting Principles. All fees and expenses relating to the work performed by the Neutral Arbitrator will be allocated between Buyer and Seller in the same proportion that the aggregate amount of the Disputed Items so submitted to the Neutral Arbitrator that is unsuccessfully disputed by each such party (as finally determined by the Neutral Arbitrator) bears to the total amount of such Disputed Items so submitted. The Neutral Arbitrator will deliver to Buyer and Seller a written determination (such determination to include a work sheet setting forth all material calculations used in arriving at such determination and to be based solely on information provided to the Neutral Arbitrator by Seller and Buyer) of the Disputed Items submitted to the Neutral Arbitrator within thirty (30) calendar days of receipt of such Disputed Items, which determination (absent manifest error in the calculations included therein) will be final, binding and conclusive. The final, binding and conclusive Net Working Capital Statement based either upon agreement by the Parties or deemed agreement by Buyer and Seller in accordance with Section 2.7(b), or the written determination delivered by the Neutral Arbitrator in accordance with this Section 2.7(c) will be the "Conclusive Net Working Capital Statement." If any Party fails to submit a statement regarding any Disputed Item submitted to the Neutral Arbitrator

- 6 -

ARCHER-00270516

within the time determined by the Neutral Arbitrator or otherwise fails to give the Neutral Arbitrator access as reasonably requested, then the Neutral Arbitrator shall render a decision based solely on the evidence timely submitted and the access afforded to the Neutral Arbitrator by the other Party.

(d)  After final determination of the Conclusive Net Working Capital Statement, then (i) if the Net Working Capital Amount set forth on the Conclusive Net Working Capital Statement is greater than the Estimated Net Working Capital Amount, Buyer shall pay to Seller an amount equal to the amount by which the Net Working Capital Amount exceeds the Estimated Net Working Capital Amount, or (ii) if the Net Working Capital Amount set forth on the Conclusive Net Working Capital Statement is less than the Estimated Net Working Capital Amount, Seller shall pay to Buyer an amount equal to the amount by which the Estimated Net Working Capital Amount exceeds the Net Working Capital Amount (such payment, the "Final Net Working Capital Payment").  Payment of the Final Net Working Capital Payment shall be made within two (2) Business Days after final determination of the Conclusive Net Working Capital Statement by the Party owing the same by confirmed wire transfer to a bank account or accounts to be designated by the other Party.

(e)  Any amount payable to any Party pursuant to this Section 2.7 shall be treated as an adjustment to the Purchase Price.

(f)  After the Closing and until the Net Working Capital Amount has been determined to be final in accordance with this Section 2.7, Buyer shall, and shall cause each Purchased Company to, provide to Seller and its Representatives reasonable access to the Books and Records and to any other information (to the extent permitted by applicable Law), including work papers of their respective accountants (to the extent permitted by such accountants), and to any employees and premises during regular business hours and on reasonable advance notice, to the extent necessary for Seller to determine the Net Working Capital Amount, and to prepare materials for presentation to the Neutral Arbitrator in connection with this Section 2.7.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF SELLER

Except as (i) set forth in the Disclosure Schedules attached hereto (collectively, the "Disclosure Schedules") or (ii) disclosed in the Registration Statement (excluding any disclosures set forth in any "risk factor" section and in any section relating to forward-looking statements to the extent that they are cautionary, predictive or forward-looking in nature), in each case where the relevance of the information as an exception to (or disclosure for purposes of) a particular representative is reasonably apparent on the face of such disclosure, Seller hereby represents and warrants to Buyer as follows:

**Section 3.1**  Organization and Qualification.

- 7 -

Confidential

(a)    Existence; Organization; Qualification.  Each of the Seller Parties is duly organized or incorporated (as applicable), and is validly existing, under the laws of its jurisdiction of organization.  Each of the Purchased Companies has all requisite corporate (or, in the case of the Purchased LLCs, limited liability company) power and authority to own or lease and operate its properties and assets and to carry on its business as presently conducted. Each of the Purchased Companies is duly qualified or licensed to do business and is in good standing in each jurisdiction where the conduct of its business requires such qualification or license, in each case except for failures to be so qualified, licensed or in good standing that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. Schedule 3.1(a) of the Disclosure Schedules sets forth each such jurisdiction where the conduct of business of the Purchased Companies as currently conducted requires such qualification or license, except for failures to be so qualified, licensed or in good standing that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)    Organizational Documents.  The Seller Parties have heretofore made available to Buyer complete and correct copies of all of the certificates of incorporation, articles, by-laws or other organizational documents (the "Organizational Documents") of each Purchased Company, each as amended as of the date hereof, and such Organizational Documents are in full force and effect. None of the Purchased Companies is in default in any material respect under or in violation in any material respect of any provision of its Organizational Documents.

(c)    Great White Energy Services, Inc., a Delaware corporation, has not since its formation owned or leased any assets or conducted any business, other than as the registrant under the Registration Statement.

**Section 3.2**    Corporate Authorization.  Each of the Seller Parties has the requisite corporate (or, in the case of the Purchased LLCs, limited liability company) power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery and performance by each of the Seller Parties of this Agreement and each of the Ancillary Agreements to which any of them is a party has been duly and validly authorized by the applicable Seller Parties and no additional corporate (or, in the case of the Purchased LLCs, limited liability company) authorization or consent by any of the Seller Parties is required in connection therewith.

**Section 3.3**    Binding Effect.  This Agreement constitutes, and each of the Ancillary Agreements to which any of the Seller Parties is a party, when executed and delivered by the parties thereto, will constitute, a valid and legally binding obligation of each of the applicable Seller Parties, enforceable against each of the Seller Parties, as applicable, in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium laws or other similar laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable

- 8 -

Confidential

remedies (regardless of whether such enforceability is considered in a proceeding in equity or law).

**Section 3.4**   Regulatory Approvals and Non-Governmental Consents.

(a)     Except as set forth in Schedule 3.4(a) of the Disclosure Schedules (the "Seller Regulatory Approvals"), no Governmental Authorization, notice or filing is required to be obtained by any Seller Party from, or to be given by any Seller Party to, or made by any Seller Party with, any Governmental Entity, as a result of execution and delivery of, or performance of any obligations under, this Agreement or  any Ancillary Agreement, except (i) any filings required to be made under the HSR Act, (ii) as may be necessary as a result of any facts or circumstances relating to the Buyer or any of its Affiliates or (iii) any such Governmental Authorization, notice or filing that if not obtained, given or made would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)     Except as set forth in Schedule 3.4(b) of the Disclosure Schedules (the "Seller Non-Governmental Consents"), no notice, consent, approval, waiver or authorization is required to be obtained by any Seller Party from, or to be given by any Seller Party to, or made by any Seller Party with, any Person other than a Governmental Entity, as a result of the execution, delivery or performance by any Seller Party of this Agreement and the Ancillary Agreements, except for such notices, consents, approvals, waivers or authorizations of which the failure to obtain would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(c)     Other than with respect to Company Intellectual Property Rights, ERISA, Employment Matters, Tax, Environmental Laws and Certain Business Practices, which are the subjects of Section 3.10, 3.11, 3.12, 3.15, 3.18 and 3.23, respectively, each Purchased Company holds all permits, licenses, certifications, variations, exemptions, orders, franchises, registrations, filings, approvals, authorizations or other required grant of operating authority required by any Governmental Authority necessary for the conduct of its respective business as currently conducted (the "Company Permits"), except where the failure to hold any of the Company Permits would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  All Company Permits are in full force and effect, and there exists no default thereunder or breach thereof, and none of Seller Parties has received any written notice, nor, to Seller's Knowledge, has any notice been given, that any such Company Permit will not be renewed in the ordinary course of business following the Closing, except for defaults, breaches or nonrenewals that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  No Governmental Authority has given or, to Seller's Knowledge, threatened to give, written notice of any action to terminate, cancel or reform any Company Permits, except for terminations, cancellations or reforms that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

- 9 -

Confidential

ARCHER-00270519

**Section 3.5**    Non-Contravention.  The execution, delivery and performance by each Seller Party of this Agreement, and the execution, delivery and performance by each Seller Party of the Ancillary Agreements to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not (a) violate any provision of the Organizational Documents of any Seller Party; (b) assuming receipt of all notices, approvals, waivers and authorizations set forth on Schedules 3.4(a) and (b) of the Disclosure Schedules, conflict with, or result in the breach of, or constitute a default under, or result in the termination of, or the right of termination, cancellation, modification or acceleration (whether after the giving of notice or the lapse of time or both) of any right or obligation of any Purchased Company under, or result in a loss of any benefit to which any Purchased Company is entitled under, any Contract to which any Seller Party is a party, or result in the creation of any Lien upon any of the Transferred Interests or any Lien (other than Permitted Liens) upon any assets of the Purchased Companies; or (c) assuming the making of all notices and filings set forth on Schedule 3.4(a) of the Disclosure Schedules, violate or result in a breach of or constitute a default under any Law or Governmental Authorization to which any Seller Party is subject, other than, in the case of clauses (b) and (c), conflicts, breaches, terminations, defaults, cancellations, accelerations, losses, violations or Liens that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**Section 3.6**    Assets; Capitalization; Equity Interests.

(a)    Assets.  (i) Each of the Purchased Companies has good and valid title to or a valid leasehold interest in all of the tangible assets owned, leased or used by it and necessary to operate its respective businesses (collectively, the "Company Assets"), in each case free and clear of all Liens other than Permitted Liens; (ii) Schedule 3.6(a)(ii) sets forth a register of all Company Assets as of May 31, 2011; and (iii) the Company Assets constitute all of the tangible assets and rights necessary to operate the businesses of the Purchased Companies in substantially the same manner as the Purchased Companies have been operating their respective businesses since March 31, 2011. Seller does not currently own, and since its incorporation has not owned, any assets other than the outstanding equity of each Purchased Company.

(b)    Transferred Interests.  Seller has good and valid title to the Transferred Interests, free and clear of all Liens (other than (i) prior to the Closing, Liens for Taxes, assessments and other governmental charges not yet due and payable and (ii) transfer restrictions imposed on equity securities by applicable securities laws), including any Liens arising from the issuance of Class B Units of Great White Pressure Control LLC.  At Closing, the Transferred Interests that Seller will deliver to Buyer will represent one hundred percent (100%) of the outstanding equity interests in each Purchased Company, free and clear of all Liens.

(c)    Capitalization; Ownership of Equity Interests.  The authorized capital stock or other equity interests of each Purchased Company and the ownership of such capital stock or other equity interests is set forth in Schedule 3.6(c) of the Disclosure Schedules.  The authorized

- 10 -

Confidential

capital stock or other equity interests set forth in Schedule 3.6(c) of the Disclosure Schedules constitute the only issued and outstanding shares of capital stock or other equity interests of the Purchased Companies, and such shares or equity interests have been all duly authorized and, to the extent the following concepts are applicable thereto, are validly issued, fully paid and nonassessable and have not been issued in violation of any preemptive or other similar right.

(d)      Agreements with Respect to Equity Interests.  (i) There are no preemptive or other outstanding rights, options, warrants, conversion rights, stock appreciation rights, redemption rights, repurchase rights, agreements, arrangements or commitments of any character (each a "Derivative Interest") under which any Purchased Company is or may become obligated to issue or sell, or give any Person a right to subscribe for or acquire, or in any way dispose of, any shares of the capital stock or other equity interests, or any securities or obligations exercisable or exchangeable for or convertible into any shares of the capital stock or other equity interests, of any Purchased Company, and no securities or obligations evidencing such rights are authorized, issued or outstanding; (ii) none of the outstanding stock or other equity interests of any of the Purchased Companies is subject to any voting trust agreement or other contract, agreement or arrangement restricting or otherwise relating to the voting, dividend rights or disposition of such stock or other equity interests; and (iii) there are no phantom stock or similar rights providing economic benefits based, directly or indirectly, on the value or price of the stock or other equity interests of any of the Purchased Companies.

(e)      Indebtedness.  Immediately after the Closing, none of the Purchased Companies will have any outstanding Indebtedness except for (i) any accounts payable reflected in the Net Working Capital Amount and (ii) the real estate capital leases listed on Schedule 3.6(e), each of which is identified thereon as a "Building Lease Retained."

(f)      Subsidiaries.  None of the Purchased Companies owns any capital stock or any other equity interests or any Derivative Interest in any other Person.

**Section 3.7**      Financial Statements; No Undisclosed Liabilities.

(a)      On or prior to the date hereof, the Seller Parties have made available to Buyer a correct and complete copy of (i) the audited consolidated balance sheet of the Seller Parties as of December 31, 2010 and the related consolidated statements of operations and cash flows, in each case, including notes thereto, for the year ended December 31, 2010 (collectively, the "Audited Financial Statements"); and (ii) the unaudited consolidated balance sheet of the Seller Parties as of March 31, 2011 (the "Balance Sheet") and the related consolidated statements of operations and cash flows, in each case, for the three months ended March 31, 2011 (collectively, the "Unaudited Financial Statements" and, together with the Audited Financial Statements, the "Financial Statements").

(b)      Each of the balance sheets contained in the Financial Statements fairly presents in all material respects the consolidated financial condition of the Seller Parties as of the

- 11 -

Confidential

date thereof, and each of the statements of operations and cash flows or equivalent statements contained in the Financial Statements (including any related notes and schedules thereto) fairly presents in all material respects the consolidated results of operations of the Seller Parties for the periods specified in such statement, in each case in accordance with GAAP consistently applied during the periods involved.

(c)   None of the Purchased Companies has any liabilities or obligations (accrued, contingent or otherwise) that would be required to be disclosed on a balance sheet (or notes thereto) prepared in accordance with GAAP (as in effect on the date thereof), other than any such liabilities or obligations (i) for Taxes, (ii) reflected or reserved against in the Balance Sheet or (iii) incurred since March 31, 2011 in the ordinary course of business consistent with past practices and that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**Section 3.8**    Litigation and Claims.

(a)   As of the date hereof and, to Seller's Knowledge, as of the Closing Date, there are no civil, criminal or administrative actions, proceedings, suits, demands, claims, hearings, inquiries, written notices of violation or investigations ("Litigation") pending or, to Seller's Knowledge, threatened against any of the Purchased Companies or against Seller or any of its Affiliates that, individually or in the aggregate, has had or would reasonably be expected to result in a Material Adverse Effect and (ii) none of Seller or any of its Affiliates (including the Purchased Companies) is subject to any order, writ, judgment, award, injunction or decree of any Governmental Entity of competent jurisdiction or any arbitrator or arbitrators that has had or would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)   To Seller's Knowledge, Schedule 3.8(b)(i) of the Disclosure Schedules sets forth all Seller Released Liabilities existing as of the date hereof. "Seller Released Liabilities" means all Liabilities of any kind or nature whatsoever arising directly or indirectly from any act, omission, event or transaction occurring (or any circumstances existing), relating to (i) Seller's capacity as a current or former stockholder, optionholder or agent of any of the Purchased Companies; (ii) any rights of indemnification or contribution, whether pursuant to any Organizational Document, contract, applicable law or otherwise; or (iii) any Contract to which any Purchased Company is a party that is with, or for the benefit of, Seller or any of its Affiliates (other than any Purchased Company), other than (x) any such Contract in existence on the date hereof that is not material and that is on terms, on the whole, no less favorable to such Purchased Company than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate of such Purchased Company, (y) the Contracts listed on Schedule 3.8(b)(ii) and (z) any obligation that accrues after the Closing under any Contract with Serva Group LLC listed on Schedule 2.3(d) or entered into after the date of this Agreement in accordance with Section 5.4(b)(xix).

- 12 -

Confidential

**Section 3.9**   Compliance with Law; Regulatory Matters.  Other than with respect to Employee Benefits, Employee Matters, Real Property, Environmental Compliance and Certain Business Practices, which are the subjects of Section 3.11, 3.12, 3.14, 3.18 and 3.23, respectively, (a) each of the Purchased Companies has been since January 1, 2007 (or since its formation if a shorter time), and is currently, in compliance with applicable Law, except such failures to so comply that, individually or in the aggregate, have not had or would not be reasonably expected to result in a Material Adverse Effect and (b) Seller has heretofore made available to Buyer complete and correct copies of all written notices received by Seller or any Purchased Company since January 1, 2007 alleging any violation under any applicable Law, other than any notices that, individually or in the aggregate, have not had or would not reasonably be expected to result in a Material Adverse Effect.

**Section 3.10**   Intellectual Property.

(a)   Schedule 3.10(a) of the Disclosure Schedules contains a complete and correct list of all active registrations of, and all pending applications to register any, Company Intellectual Property Rights, in each case as of the date hereof. The Company Intellectual Property Rights identified on Schedule 3.10(a) of the Disclosure Schedules are validly registered, held and/or recorded in the name of a Purchased Company and are not, to Seller's Knowledge, subject to any pending cancellation, interference, reissue or reexamination proceeding.

(b)   The Purchased Companies (i) own the exclusive right, title and interest to all Company Intellectual Property Rights, free and clear of all Liens (other than Permitted Liens and non-exclusive licenses granted by any Purchased Company to any Person, including implied licenses granted by any Purchased Company in connection with the commercial sale of products) and (ii) have valid licenses to use all other Intellectual Property Rights used in their respective businesses, except in the cases of clauses (i) and (ii) that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(c)   Neither Seller nor any its Affiliates (including the Purchased Companies) has received any written communication in the last four (4) years alleging that any Purchased Company has violated, diluted, infringed or misappropriated any Intellectual Property Rights of any Person.  To Seller's Knowledge, the operation of the businesses of each of the Purchased Companies as previously conducted and as currently conducted, including the products and services thereof, does not infringe, dilute, violate or misappropriate any Intellectual Property Right owned by any Person, except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  To Seller's Knowledge, no Person is infringing upon or diluting or misappropriating or violating any of the Company Intellectual Property Rights.  To Seller's Knowledge, the Purchased Companies have not experienced any breach of information security or unauthorized disclosure of such trade secrets or confidential information, other than any breaches or unauthorized disclosures that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

- 13 -

Confidential

ARCHER-00270523

(d)     Each of the Purchased Companies has valid licenses to use all of the software necessary to conduct its business as conducted immediately prior to Closing.

**Section 3.11**   Employee Benefits.

(a)     Schedule 3.11(a) of the Disclosure Schedules sets forth a complete and accurate list of all Benefit Plans denoting which Benefit Plans are solely sponsored by a Purchased Company and identifying such Purchased Company.  The term "Benefit Plan" means any employee benefit plan, including any "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA (including post-retirement medical and life insurance), any "employee pension benefit plan" within the meaning of Section 3(2) of ERISA (regardless of whether such plan is subject to ERISA), any multiemployer plan (as defined in Section 3(37) of ERISA) or multiple employer plan (as defined in Section 413 of the Code), and any profit-sharing, bonus, stock option, stock purchase, restricted stock units/shares, stock ownership, pension, retirement, deferred compensation, excess benefit, post-retirement medical or life insurance, welfare, incentive, sick leave or other leave of absence, short- or long-term disability, retention, employment severance, change of control, salary continuation, medical, hospitalization, life insurance, fringe benefit or other plan, program, policy, practice, agreement or other arrangement, whether or not subject to ERISA, (i) maintained, entered into or contributed to by Seller, and any of the Purchased Companies, or by any trade or business, whether or not incorporated (an "ERISA Affiliate"), that together with Seller or any of the Purchased Companies would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA, or to which Seller or an ERISA Affiliate is a party, whether written or oral, for the benefit of any present or former employee, director, or consultant of the Purchased Companies (including their dependents or beneficiaries) or (ii) under which could reasonably be expected to have any present or future liability.  With respect to each Benefit Plan, Seller has made available to Buyer a current, accurate and complete copy thereof (or a written description of the material terms of any Benefit Plan that is not in writing), and, to the extent applicable: (i) any related trust agreement or other funding instrument; (ii) the most recent determination letter, if applicable; (iii) any summary plan description and summaries of material modifications or other form of material communication or description of material terms; and (iv) the most recent year's Form 5500 and attached schedules and audited financial statements (or other applicable annual report).

(b)     Each Benefit Plan complies in all respects in form with all applicable Laws and has been maintained, administered and operated in all respects in accordance with its terms and in accordance with applicable Laws, other than any failure to be so maintained that would not, individually or in the aggregate, reasonably be expected to result in a material liability to Buyer or any of its subsidiaries.  There is no Litigation pending, or to Seller's Knowledge, threatened, with respect to any Benefit Plan (other than routine claims for benefits in the ordinary course of business) that would, individually or in the aggregate, reasonably be expected to result in a material liability to Buyer or its subsidiaries (including, after the Closing, the Purchased Companies).

- 14 -

Confidential

(c)      No Benefit Plan is a defined benefit pension plan or is subject to Section 302 or Title IV of ERISA or Section 412 of the Code.  No Benefit Plan is a multiemployer plan within the meaning of Section 3(37) of ERISA.  No liability under Title IV of ERISA has been incurred by Seller or any ERISA Affiliate which has not been satisfied in full, and no event has occurred and no condition exists that could reasonably be expected to result in Seller, the Purchased Companies or any ERISA Affiliate incurring a direct or indirect liability under Title IV of ERISA.

(d)      The Benefit Plans that are "employee pension benefit plans" (within the meaning of Section 3(2) of ERISA) and that are intended to meet the qualification requirements of Section 401(a) of the Code (each, a "Pension Plan") have received or have timely submitted a request for a favorable determination letter, opinion or advisory letters from the IRS to the effect that such Pension Plans and the related trusts are qualified and exempt from U.S. federal income taxes under Sections 401(a) and 501(a) of the Code, respectively, and nothing has occurred that would reasonably be expected to adversely affect the qualification of such Pension Plans or related trusts.  No nonexempt "prohibited transaction" (as such term is defined in Section 406 of ERISA and Section 4975 of the Code) has occurred with respect to any Benefit Plan that could reasonably be expected to subject Seller or any ERISA Affiliate to any liability. All contributions required to be made to or with respect to any Benefit Plan have been timely made.

(e)      Except as otherwise contemplated under this Agreement, neither the execution nor delivery of this Agreement nor the consummation of the transactions contemplated hereby shall, whether alone or in combination with any other event, result in (i) the accelerated vesting or payment of, or any increase in, any compensation to any present or former employee, director or consultant of any of the Purchased Companies or (ii) the entitlement of any present or former employee, director or consultant of any of the Purchased Companies to severance or termination pay or benefits.

(f)      With respect to any payment or benefit payable (or potentially payable) to a "disqualified individual" (as defined in Section 280G of the Code and the underlying regulations (together, "Section 280G")) with respect to a Seller Party which may constitute a "parachute payment" (as defined in Section 280G) in connection with the transactions contemplated by this Agreement, either (i) such payment will not constitute an "excess parachute payment" as defined in Section 280G due to its having a value less for purposes of Section 280G than the allocable portion of the "base amount" of the disqualified individual or (ii) prior to Closing, the Seller shall cause such payment to be approved by a vote of its shareholders in a manner which satisfies the requirements of Sections 280G(b)(5)(A)(ii) and 280G(b)(5)(B) of the Code, such that the payment does not constitute a "parachute payment" for purposes of Section 280G.

(g)      Neither Seller nor any ERISA Affiliate (i) maintains or contributes to any Benefit Plan which provides, or has any liability to provide, life insurance, medical, severance or other employee welfare benefits to any employee, director, independent contractor or consultant of any of the Purchased Companies upon his or her retirement or termination of employment,

- 15 -

Confidential

except as may be required by Section 4980B of the Code or similar Law or (ii) has ever represented, promised or contracted (whether in oral or written form) to any employee, director, independent contractor or consultant of any of the Purchased Companies (either individually or as a group) to do so, except to the extent required by Section 4980B of the Code or similar Law. No liability under Section 4980B of the Code or any similar Laws has been incurred by Seller, any of the Purchased Companies or any ERISA Affiliate which has not been satisfied in full and no event has occurred and no condition exists that could reasonably be expected to result in the Purchased Companies incurring a direct or indirect liability under the applicable requirements of Section 4980B of the Code or any similar Laws.

(h)     Prior to the Closing, Seller shall deliver <u>Schedule 3.11(h)</u> to Buyer, which shall set forth a true and complete list and description of the agreements and arrangements between Seller and any of its Affiliates (other than a Purchased Company), on the one hand, and any individual who is, or is contemplated to become, an employee of any Purchased Company at or prior to Closing, on the other hand, other than the Benefit Plans.

**Section 3.12**   <u>Employment Matters</u>.

(a)     No Purchased Company is or has been party to or bound by a collective bargaining agreement or other labor-related agreement, and no employees are or have been represented by any labor organization or employee association with respect to their employment by the Purchased Companies.  No labor union, labor organization or group of Employees has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to Seller's Knowledge, threatened in writing to be brought or filed with the National Labor Relations Board or any other Governmental Entity.  To Seller's Knowledge, no labor union has planned or is planning any organizing activities with respect to any Employees.  There have been no actual or, to Seller's Knowledge, threatened labor disputes, strikes, lockouts or work stoppages against or affecting any of the Purchased Companies within the past two years.  To Seller's Knowledge, no group of field level operating personnel or independent contractor of any of the Purchased Companies has any plans to terminate his, her or its relationship or employment with such Purchased Company.

(b)     There is no unfair labor practice charge, material grievance, arbitration, charge, lawsuit or complaint against any Purchased Company pending before a Governmental Entity or, to the Seller's Knowledge, threatened, nor has any such matter been settled or resolved in the past two years.  In the past two years, none of the Purchased Companies has received written notice of the intent of any Governmental Entity responsible for the enforcement of employment laws to conduct an investigation with respect to or relating to them, nor has any of the Purchased Companies received written notice that any such investigation is in progress.

(c)     For the past two years, each Purchased Company has been operated in compliance with, and each Purchased Company currently is in compliance with, all Laws

- 16 -

Confidential

relating to employment, including, but not limited to, wage and hours, health and safety, child labor, immigration, discrimination, disability rights or benefits, equal opportunity, plant closures and layoffs, affirmative action, workers' compensation, labor relations, employee leave and unemployment insurance, except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(d)    To Seller's Knowledge, no Employee is in any respect in violation of any term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, noncompetition agreement, restrictive covenant or other obligation to a former employer of any such employee relating (i) to the right of any such employee to be employed by the respective Purchased Company or (ii) the knowledge of use of trade secrets or proprietary information.

(e)    None of the Purchased Companies is materially delinquent in payments to any current or former employee for any services or amounts required to be reimbursed or otherwise paid.

(f)    To Seller's Knowledge, each of the Purchased Companies has at all times properly classified and treated, under applicable Law, each of its workers as an employee or independent contractor, and, in the case of employees, has properly classified and treated, under applicable Law, each of its employees as exempt or non-exempt from overtime wage requirements (including in respect of each Benefit Plan), except to the extent any misclassification is not reasonably likely to result in a Material Adverse Effect.

(g)    None of the Purchased Companies is a party to any agreement nor do any facts or circumstances exist which would require any Purchased Company or Buyer or any of its Affiliates to pay any additional compensation, bonuses (including, without limitation, any retention bonuses) or other amounts as a result, in whole or in part, of the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, to any employee or former employee of Seller or any of the Purchased Companies.

Section 3.13    Material Contracts.

(a)    Schedule 3.13(a) of the Disclosure Schedules sets forth a correct and complete list of the following Contracts to which any of the Purchased Companies is a party as of the date hereof:

(i)    Contracts where (A) the performance remaining thereunder involves aggregate consideration to or by any Purchased Company in excess of $200,000 per annum, other than "shrink wrap" or "click through" license agreements or other software license agreements entered into in the ordinary course of business, and (B) such contract is not cancelable, without penalty, by any Purchased Company on 180 days' notice or less;

- 17 -

Confidential

(ii)    Contracts which, upon the consummation of the transactions contemplated by this Agreement, will (either alone or upon the occurrence of any additional acts or events) result in any payment or benefits (whether of severance pay or otherwise) becoming due, or the acceleration or vesting of any rights to any payment or benefits, from any Purchased Company or Buyer to any Person;

(iii)    Contracts which restrict in any material respect or contain limitations on the ability of any Purchased Company or any of its Affiliates to compete in any line of business or in any geographic territory;

(iv)    Contracts (including any intercompany Indebtedness, guarantee, receivable or payable) between any Purchased Company, on the one hand, and Seller or its Affiliates (other than any Purchased Company), on the other hand;

(v)    Contracts which relate to Indebtedness of any Purchased Company or the guarantee thereof (excluding, for the avoidance of doubt, Contracts evidencing liabilities with respect to deposits and accounts, trade payables, letters of credit or capital leases made in the ordinary course of business);

(vi)    mortgages, pledges or security agreements or similar arrangements constituting a Lien upon the assets or properties of any Purchased Company or the Transferred Interests, in each case granted in connection with the incurrence of Indebtedness for borrowed money;

(vii)    Contracts for the sale or purchase of personal property having a value individually, with respect to all sales or purchases thereunder, in excess of $200,000 or, together with all related Contracts, in excess of $500,000;

(viii)    Contracts pursuant to which any Purchased Company (A) licenses or otherwise obtains a right to use material Intellectual Property Rights from a third party or (B) licenses or otherwise provides a right to use material Company Intellectual Property Rights to a third party;

(ix)    any collective bargaining agreements or other labor-related agreement with any labor union or other representative of a group of employees;

(x)    Contracts for the sale or purchase of fixed assets or real estate having a value individually, with respect to all sales or purchases thereunder, in excess of $200,000 or, together with all related Contracts, in excess of $500,000;

(xi)    any material joint venture agreement, joint operating agreement, partnership agreement or other similar agreement involving a sharing of profits and expenses;

- 18 -

Confidential

(xii)    Contracts entered into by a Purchased Company during the past three years (or since its formation if a shorter time) relating to the acquisition by any Purchased Company of any Person or other business organization, division or business of any Person (including through merger or consolidation or the purchase of a controlling equity interest in or substantially all of the assets of such Person or by any other manner); and

(xiii)    any other Contract material to the Purchased Companies taken as a whole, whether or not entered into in the ordinary course of business.

Each Contract of the type described in this Section 3.13(a) whether or not set forth on Schedule 3.13(a) of the Disclosure Schedules, is referred to herein as a "Material Contract."

(b)    Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, all Material Contracts are in full force and effect and enforceable against the applicable Purchased Company party thereto and, to Seller's Knowledge, each other party thereto, in each case in accordance with the express terms thereof. There does not exist under any Material Contract any violation, breach or event of default, or alleged violation, breach or event of default, or event or condition that, after notice or lapse of time or both, would constitute a violation, breach or event of default under any Material Contract on the part of the applicable Purchased Company, or, to Seller's Knowledge, any other party thereto, in each case except for such violations, breaches, events or conditions that would not, individually and in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(c)    Seller has previously made available to Buyer a true, complete and correct copy of each written Material Contract in effect as of the date of this Agreement.

**Section 3.14**    Real Property.

(a)    Schedule 3.14(a) of the Disclosure Schedules sets forth a correct and complete list of all real property that is (i) owned by any of the Purchased Companies (the "Owned Real Property") or (ii) leased and occupied by any of the Purchased Companies (the "Leased Real Property").  Seller has, or has caused to be, made available to Buyer correct and complete copies of each of the leases corresponding to the Leased Real Property (the "Leases") and any documents or instruments affecting the rights or obligations thereunder of any of the parties thereto.

(b)    The Owned Real Property is not subject to any Lien, lease or material license or sublicense, except for Permitted Liens and other exceptions that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(c)    The ownership, occupancy, use and operation of the Owned Real Property and the Leased Real Property complies with all applicable Laws and Governmental Authorizations and does not violate any instrument of record or agreement affecting such

- 19 -

Confidential

ARCHER-00270529

property, except for failures to comply or violations that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(d)     There are no pending or, to Seller's Knowledge, threatened appropriation, condemnation, eminent domain or like proceedings relating to the Owned Real Property or the Leased Real Property, except for any appropriation, condemnation, eminent domain or like proceedings that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**Section 3.15**     Taxes.

(a)     None of the Purchased LLCs has been treated as a corporation for U.S. federal income tax purposes at any point since formation.

(b)     All Tax Returns of any of the Purchased Companies that are required to be filed on or before the Closing (taking into account any available extensions) have been or will have been duly filed and all Taxes required to be paid by any of the Purchased Companies have been or will be duly and timely paid, except for such amounts that are being contested in good faith by appropriate action and for which adequate provisions have been established according to GAAP.  All such Tax Returns are true, correct and complete in all respects.

(c)     All Taxes that each of the Purchased Companies has been required to collect or withhold from payments made to any Person have been duly collected or withheld and timely paid (or, to the extent not yet required to be paid, have been accrued) to the appropriate taxing or other Governmental Entity.

(d)     There are no Liens for Taxes upon any of the Transferred Interests, or any property or assets of any of the Purchased Companies other than Liens for Taxes that are not yet due and payable or for Taxes, the validity or amount of which is being contested by a Purchased Company or one of its Affiliates in good faith by appropriate action and for which adequate provisions under GAAP have been established.

(e)     (i) No deficiencies for Taxes of the any of the Purchased Companies have been claimed in writing, proposed in writing or assessed in writing by any taxing or other Governmental Entity that have not been finally settled or paid; (ii) there are no pending or threatened audits, suits, proceedings, actions or claims for or relating to any liability in respect of Taxes of any of the Purchased Companies; (iii) none of the Purchased Companies has waived any statute of limitations with respect to Taxes or agreed to any extension of time with respect to any Tax assessment or deficiency for any open tax year; and (iv) none of the Purchased Companies has requested an extension to file any Tax Return which has not yet been filed. Audits of federal and state Tax Returns by the relevant taxing or other Governmental Entities have been completed for the Tax Periods set forth on <u>Schedule 3.15</u> of the Disclosure Schedules. None of the Purchased Companies has received written notice of any claim made by a

- 20 -

ARCHER-00270530

Governmental Entity in a jurisdiction where a Purchased Company does not file a Tax Return that such Purchased Company is or may be subject to taxation by such jurisdiction.

(f)     No Purchased Company is a party to or bound by any binding tax sharing, tax indemnity or tax allocation agreement or other similar arrangement with any Person providing for the allocation, indemnification or sharing of Taxes. No Purchased Company (i) has been a member of an affiliated group (or similar state, local or foreign filing group) filing a consolidated Tax Return or (ii) has any liability for the Taxes of any Person under Treasury Regulation § 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, by contract or otherwise.

(g)     No Purchased Company has (i) agreed to make nor is required to make any material adjustment under Section 481(a) of the Code by reason of a change in accounting method or otherwise; or (ii) constituted either a "distributing corporation" or a "controlled corporation" (within the meaning of Section 355(a)(1)(A) of the Code) in a distribution of stock intended to qualify for tax-free treatment under Section 355 of the Code (A) in the two (2) years prior to the date of this Agreement or (B) in a distribution which could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) in connection with the transactions described in this Agreement.

(h)     No closing agreements, private letter rulings, technical advice memoranda or similar agreements or rulings have been entered into or issued by any Governmental Entity with respect to any Purchased Company that would be effective after the Closing Date, and no such agreement or ruling has been applied for and is currently pending.

(i)     No Purchased Company has entered into a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4(b).

(j)     No Purchased Company shall be required to include in a Post-Closing Tax Period taxable income attributable to income of the Purchased Company that accrued in a Pre-Closing Tax Period but was not recognized in any Pre-Closing Tax Period as a result of (i) the installment method of accounting, (ii) the long-term contract method of accounting, (iii) a "closing agreement" as described in Section 7121 of the Code (or any provision of any foreign, state or local Tax law having similar effect), or (iv) any election under Section 108(i) of the Code (or similar provisions of state, local or foreign law).

(k)     No Purchased Company has (i) made an election, or is required, to treat any asset as owned by another person pursuant to the provisions of former Section 168(f) of the Code or as tax-exempt bond financed property or tax-exempt use property within the meaning of Section 168 of the Code; (ii) acquired any assets that directly or indirectly secure any debt the interest on which is tax exempt under Section 103(a) of the Code; or (iii) made any of the foregoing elections or is required to apply any of the foregoing rules under any comparable state or local Tax provision.

- 21 -

ARCHER-00270531

**Section 3.16**   Insurance.  Seller has made, or has caused to be made, available to Buyer all of the material insurance policies or binders as to which any of the Purchased Companies is a policyholder or which covers the business or assets of any of the Purchased Companies ("Insurance Policies") as of the date hereof, and Schedule 3.16 sets forth a complete list of the Insurance Policies.  Each Purchased Company (or one of its Affiliates, if applicable) has paid all premiums due and payable, and has otherwise performed all of its respective obligations in all material respects, under each policy to which such Purchased Company is a party or under which it receives coverage.

**Section 3.17**   Finders' Fees.  Except for fees payable to Raymond James & Associates, Inc., which fees will be paid by Seller, there is no fee or commission payable by Seller or any of its Affiliates (including the Purchased Companies) to any investment banker, broker, finder, intermediary or other Person that has been retained by or is authorized to act on behalf of Seller or any of its Affiliates in connection with the transactions contemplated hereby.

**Section 3.18**   Environmental Compliance.

(a)    Each Purchased Company has obtained all Environmental Permits that are required for the ownership and operation of their respective businesses and properties, all such Environmental Permits are in effect and no appeal nor any other action is pending to revoke any such Environmental Permit. To the extent required by applicable Environmental Laws, the Purchased Companies have filed (or will have filed by the Closing Date) all applications necessary to renew or obtain any Environmental Permits in a timely fashion so as to allow the Purchased Companies to continue to operate their businesses in compliance with applicable Environmental Laws.

(b)    Each Purchased Company is and has been for the applicable statute of limitations period in compliance with all Environmental Permits and with all applicable Environmental Laws.

(c)    There is no Environmental Claim pending or, to Seller's Knowledge, threatened, against any Purchased Company or, to Seller's Knowledge, against any person or entity whose liability for any Environmental Claim any Purchased Company has or may have retained or assumed either contractually or by operation of law.

(d)    The Purchased Companies are not subject to any orders, decrees, judgments, injunctions, or awards in connection with an Environmental Claim or pursuant to applicable Environmental Law.

(e)    There are no present or past actions, activities, circumstances, conditions, events or incidents, including the Release or presence of any Hazardous Material that could form the basis of an Environmental Claim or could otherwise result in a Loss or liability (contingent or

- 22 -

Confidential

otherwise) pursuant to Environmental Law against any of the Purchased Companies, or, to Seller's Knowledge, could form the basis of an Environmental Claim or a Loss or liability (contingent or otherwise) pursuant to Environmental Law against any Person whose liability for such orders, writs, judgments, Losses, awards, injunctions, decrees or Litigations any Purchased Company has or may have retained or assumed either contractually or by operation of law.

(f)    To Seller's Knowledge, Seller has delivered or otherwise made available to Buyer true and complete copies of all material environmental reports, studies, assessments and audits, and any other material documents and correspondence relating to environmental matters, relating in any way to any of the Purchased Companies, in its possession, custody or control, or the possession, custody or control of the Purchased Companies.

**Section 3.19**    Customers, Suppliers and Distributors.  Schedule 3.19 of the Disclosure Schedules sets forth a complete and accurate list of the names of the Purchased Companies' (a) ten largest customers for each of the two most recent fiscal years, showing the approximate aggregate total revenues in dollars from each such customer during each such period, and (b) ten largest suppliers for each of the two most recent fiscal years, showing the approximate aggregate total purchases in dollars by the Purchased Companies from each such supplier during each such period. (i) No Seller Party has received any written communication from any customer or supplier named on Schedule 3.19 of the Disclosure Schedules of any intention or threat to terminate or materially reduce purchases from, supplies to or sales on behalf of any Purchased Company and, (ii) to Seller's Knowledge, no such action is being considered.

**Section 3.20**    Absence of Certain Changes or Events  Except as otherwise contemplated hereby, since December 31, 2010 there has not been or occurred: (a) a Material Adverse Effect; (b) any change by any Purchased Company in its accounting methods, principles or practices (including any change in depreciation or amortization policies or rates or revenue recognition policies), except as required by either Law or GAAP; (c) any material revaluation by any Purchased Company of any of the Company Assets, excluding writing-off or discounting of notes, accounts receivable or other assets in the ordinary course of business consistent with past practice or revaluation due to loss, damage or destruction of Company Asset covered by insurance; or (d) any change by any Purchased Company in its Tax elections or accounting methods, or any closing agreement, settlement or compromise of any claim or assessment, or consent to any extension or waiver of any limitation period with respect to any claim or assessment for Taxes.

**Section 3.21**    Internal Controls.  Each of the Seller Parties maintains a system of internal accounting controls designed to provide reasonable assurance that: (a) transactions are executed in accordance with management's general or specific authorizations; (b) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability; (c) access to assets is permitted only in accordance with

- 23 -

ARCHER-00270533

management's general or specific authorization; and (d) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.  Each Seller Party maintains internal control over financial reporting that provides reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

      **Section 3.22**   Registration Statement.  As of the date of this Agreement, the Registration Statement on Form S-1 filed on February 11, 2011 by Seller with the Securities and Exchange Commission pursuant to the Securities Act (including exhibits filed therewith) (as amended, supplemented or otherwise modified through the date hereof, the "Registration Statement"), does not contain an untrue statement of a material fact, or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances in which they were made, not misleading (excluding any such untrue statement or omission which has been disclosed to Buyer in writing as of the Closing Date). As of the date of this Agreement, the Registration Statement contains all material information in connection with the Seller Parties and the Company Assets required to be disclosed therein (excluding any material information which has been disclosed to Buyer in writing as of the Closing Date).

      **Section 3.23**   Certain Business Practices.  No Seller Party nor any of their respective directors, officers or employees has, directly or indirectly, (a) made or authorized any contribution, payment or gift of funds or property to any official, employee or agent of any Governmental Entity of any jurisdiction or (b) made any contribution to any candidate for public office, in either case, where either the payment or the purpose of such contribution, payment or gift was, is or would be prohibited under any applicable anti-bribery or anti-corruption Law of any relevant jurisdiction in effect at such time and applicable to any Seller Party or any of their respective operations.  No Seller Party nor any of their respective directors, officers or employees is aware of or has taken, directly or indirectly, any action that would result in a violation by any such Person of the FCPA, including, without limitation, making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of any offer, payment, promise to pay or authorization of the payment of any money, or other property gift, promise to give, or authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any non-U.S. political party or official thereof or any candidate for non-U.S. political office, in contravention of the FCPA, and Seller and each Purchased Company has conducted its business in compliance with the FCPA.

      **Section 3.24**   Export Controls and Trade Sanctions.  Each Purchased Company has complied with all statutory and regulatory requirements relating to export controls and trade sanctions under applicable Laws, including the Export Control Laws.  None of the Seller Parties nor any of their respective directors, officers, employees or affiliates, is a Person with whom transactions are currently prohibited under any U.S. sanctions administered OFAC or equivalent European Union measure.  No Seller Party, nor any of their respective affiliates, shareholders,

- 24 -

Confidential

directors, officers or employees, has, directly or indirectly, engaged in any transaction or dealing in property or interests in property of, received from or made any contribution of funds, goods, or services to or for the benefit of, provided any payments or material assistance to, or otherwise engaged in or facilitated any transactions with a Prohibited Person.

**Section 3.25**   Accounts Receivable. At the Closing, all of the accounts receivable of the Purchased Companies will have been accrued in the ordinary course of business and will represent the bona fide legal obligations of the account debtors named therein, and are not subject to offset, counterclaim or other defense, and, to Seller's Knowledge, the recorded amount of each such receivable is collectible in the ordinary course (except as reserved in the Financial Statements). Schedule 3.25 contains a list of the accounts receivable of the Purchased Companies as of July 29, 2011 and the aging of such receivables.

**Section 3.26**   No Affiliate Transactions. Except for arrangements contemplated by this Agreement and except for transactions, agreements, arrangements or understandings that are not, individually or in the aggregate, material to the Purchased Companies, there are no transactions, agreements, arrangements or understandings, or any series of related transactions, agreements, arrangements or understandings, between any of the Purchased Companies, on the one hand, and any Affiliate thereof (including any director or officer thereof but excluding any of the other Purchased Companies), on the other hand.

**Section 3.27**   Cash Management. Since January 1, 2010, Seller and each of the Purchased Companies has maintained its cash management practices and its policies, practices and procedures with respect to the collection of trade accounts receivable, establishment of reserves for uncollectible accounts, accrual of accounts receivable, inventory control, prepayment of expenses, payment of trade accounts payable, accrual of other expenses, deferral of revenue and acceptance of customer deposits in accordance with past custom and practice.

**Section 3.28**   Equipment. All operating equipment of the Purchased Companies is in good operating condition in accordance with industry practice, ordinary wear and tear excepted.

**Section 3.29**   Projections.  The financial projections attached hereto as Schedule 3.29 and previously delivered to Buyer (the "Financial Projections") were, at the time made, based on good faith estimates and assumptions made by the management of the Seller Parties.  Each Seller Party believed that the Financial Projections were, at the time made, reasonable and attainable, it being understood that uncertainty is inherent in any forecasts or projections and that no assurance can be given that the results set forth in the Financial Projections will actually be obtained.

- 25 -

Confidential

**Section 3.30**   Limitations on Representations and Warranties.  Except as expressly set forth in this ARTICLE III or in the officer's certificate delivered to Buyer pursuant to Section 8.3(c), neither Seller nor any Purchased Company makes any representation or warranty, express or implied, at Law or in equity, with respect to itself, the Purchased Companies or any of Seller's other Affiliates, or any of their respective assets, liabilities, businesses or operations (including in respect of the correctness, accuracy or completeness of any Contract or certificate furnished or made available, or to be furnished or made available (including by way of information included or referred to in the electronic data room or otherwise), or statement made, by Seller, any of its Affiliates or their respective Representatives in connection with the transactions contemplated herein), and any such other representations or warranties are hereby expressly disclaimed.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the Disclosure Schedules, Buyer hereby represents and warrants to Seller as follows:

**Section 4.1**   Existence; Organization; Qualification.  Buyer is a corporation, duly organized, validly existing and in good standing under the laws of the State of Texas.  Buyer has all requisite corporate (or similar entity) power and authority to own or lease and operate its properties and assets and to carry on its business as currently conducted, Buyer is duly qualified to do business and is in good standing in each jurisdiction where the ownership or operation of its properties and assets or the conduct of its business requires such qualification, except for failures to be so qualified, licensed or in good standing that would not, individually or in the aggregate, reasonably be expected to result in a Buyer Material Adverse Effect.

**Section 4.2**   Corporate Authorization.  Buyer has full corporate power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which it is a party has been duly and validly authorized by Buyer and no additional corporate (or similar entity) authorization or consent by Buyer is required in connection therewith.

**Section 4.3**   Binding Effect.  This Agreement and each of the Ancillary Agreements to which Buyer is a party, when executed and delivered by the parties thereto, constitutes a valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium laws or other similar laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies.

- 26 -

Confidential

**Section 4.4**    <u>Regulatory Approvals and Non-Governmental Consents</u>.

(a)    Except as set forth in <u>Schedule 4.4(a)</u> of the Disclosure Schedules (the "<u>Buyer Regulatory Approvals</u>" and, together with the Seller Regulatory Approvals, the "<u>Regulatory Approvals</u>"), no Governmental Authorization or filing is required to be obtained by Buyer from, or to be given by Buyer to, or made by Buyer with, any Governmental Entity, as a result of the execution, delivery or performance by Buyer of this Agreement and the Ancillary Agreements, except for (i) any filings required to be made under the HSR Act, (ii) as may be necessary as a result of any facts or circumstances relating to the Seller Parties or (iii) such Governmental Authorization or filings that if failed to be obtained, given or made would not, individually or in the aggregate, reasonably be expected to result in a Buyer Material Adverse Effect.

(b)    Except as set forth in <u>Schedule 4.4(b)</u> of the Disclosure Schedules (the "<u>Buyer Non-Governmental Consents</u>" and, together with the Seller Non-Governmental Consents, the "<u>Non-Governmental Consents</u>"), no consent, approval, waiver or authorization is required to be obtained by Buyer from, or to be given by Buyer to, or made by Buyer with, any Person other than a Governmental Entity, as a result of the execution, delivery or performance by Buyer of this Agreement and the Ancillary Agreements, except for such consents, approvals, waivers or authorizations of which the failure to obtain would not, individually or in the aggregate, reasonably be expected to result in a Buyer Material Adverse Effect.

**Section 4.5**    <u>Non-Contravention</u>.  The execution, delivery and performance by Buyer of this Agreement and each of the Ancillary Agreements to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not (a) violate any provision of the Organizational Documents of Buyer, (b) conflict with, or result in the breach of, or constitute a default under, or result in the termination of, or the right of termination, cancellation, modification or acceleration (whether after the giving of notice or the lapse of time or both) of any material right or obligation of Buyer under, or result in a loss of any benefit to which Buyer is entitled under, any material Contract to which Buyer is a party or result in the creation of any Lien upon any of its material assets or (c) assuming the making of all notices and filings set forth on <u>Schedule 4.4(a)</u> of the Disclosure Schedules, violate or result in a breach of or constitute a default under any Law or Governmental Authorization to which Buyer or its Affiliates are subject, other than, in the case of clauses (b) and (c), conflicts, breaches, terminations, defaults, cancellations, accelerations, losses, violations or Liens that would not, individually or in the aggregate, reasonably be expected to result in a Buyer Material Adverse Effect.

**Section 4.6**    <u>Finders' Fees</u>.  Except for Credit Suisse, whose fees will be paid by Buyer, there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Buyer or any of its Affiliates who might be entitled to any fee or commission from Buyer or its Affiliates in connection with the transactions contemplated hereby.

- 27 -

Confidential

ARCHER-00270537

**Section 4.7**    Litigation and Claims.  There is no Litigation pending or, to Buyer's Knowledge, threatened against Buyer that, individually or in the aggregate, has had or would reasonably be expected to result in a Buyer Material Adverse Effect on Buyer's ability to execute, deliver or perform this Agreement or any Ancillary Agreement, or to timely consummate the transactions contemplated hereby or thereby.  Buyer is not subject to any order, writ, judgment, award, injunction or decree of any Governmental Entity of competent jurisdiction or any arbitrator or arbitrators that has had or would, individually or in the aggregate, reasonably be expected to result in a Buyer Material Adverse Effect on Buyer's ability to execute, deliver or perform this Agreement or any Ancillary Agreement, or to timely consummate the transactions contemplated hereby or thereby.

**Section 4.8**    Financial Capability.  Buyer has, and will have at Closing, sufficient funds and adequate financial resources to satisfy its monetary and other obligations under this Agreement.

**Section 4.9**    Investment Purpose. Buyer is acquiring the Transferred Interests solely for investment purposes and not with a view to, or for sale in connection with, any distribution thereof in violation of any Law (including the Securities Act of 1933 (the "Securities Act")), and Buyer is an "accredited investor" as defined in Rule 501(a) promulgated under the Securities Act.  The Buyer agrees that the Transferred Interests may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act and any applicable state securities Laws, except pursuant to an exemption from such registration under the Securities Act and such state Laws.  The Buyer is able to bear the economic risk of holding the Transferred Interests for an indefinite period (including total loss of its investment) and (either alone or together with its Representatives) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment in the Transferred Interests.

**Section 4.10**    Limitations on Representations and Warranties.  Except as expressly set forth in this ARTICLE IV or in the officer's certificate delivered to Seller pursuant to Section 8.2(c), Buyer does not make any representation or warranty, express or implied, at Law or in equity, with respect to itself or any of its Affiliates, or any of their respective assets, liabilities, businesses or operations (including in respect of the correctness, accuracy or completeness of any Contract or certificate furnished or made available, or to be furnished or made available, or statement made, by Buyer, any of its Affiliates or their respective Representatives in connection with the transactions contemplated herein), and any such other representations or warranties are hereby expressly disclaimed.

- 28 -

Confidential

ARCHER-00270538

ARTICLE V

COVENANTS

**Section 5.1**     <u>Access and Reports</u>.  Subject to applicable Law, upon reasonable advanced notice from Buyer to Seller, each of the Seller Parties shall afford Buyer's officers and other authorized representatives reasonable access to the properties and other assets, Books and Records, and Contracts of the Purchased Companies and, solely to the extent related to the Purchased Companies or any of their assets or businesses, of Seller, during normal business hours throughout the period prior to the Closing Date and, during such period, each of the Seller Parties shall make available as promptly as practicable to Buyer any information concerning the business, operations, assets, properties and personnel of the Purchased Companies as Buyer may reasonably request.  In addition, during such period, each of the Seller Parties shall use its commercially reasonable efforts to assist Buyer in scheduling discussions concerning the transactions contemplated hereby with any Purchased Company's material customers, suppliers, lenders and other creditors; <u>provided</u> that Buyer shall consult with Seller prior to contacting such customers, suppliers, lenders and other creditors and not contact any such customer, supplier, lender or creditor to which Seller shall have reasonably objected.  Notwithstanding the foregoing, neither Seller nor its Affiliates shall be required (a) to permit any inspection, or to disclose any information, that in the reasonable judgment of Seller or the applicable Affiliate would result in the disclosure of any trade secrets or violate any of its obligations with respect to confidentiality, (b) to disclose any information protected by the attorney-client privilege or (c) to take any action that would cause material disruption to the business of Seller or the Purchased Companies.  All requests for information made pursuant to this Section shall be directed to the Person designated by Seller in a notice given to Buyer, and all such information shall be governed by the terms of <u>Section 5.5</u> and the Confidentiality Agreement.

**Section 5.2**     <u>Access to Properties</u>.  Each of the Seller Parties will, and Seller will cause each Purchased Company to, provide reasonable access to the Owned Real Property and Leased Real Property (subject to the terms of the applicable Lease) for the sole purpose of conducting Phase I Environmental Site Assessments (the "<u>Environmental Assessments</u>").  Each Seller Party acknowledges that such Environmental Assessments are ongoing and shall provide continued access to the properties and its employees to complete such Environmental Assessments.  Furthermore, should Buyer, in its reasonable discretion, determine that further environmental investigations are warranted as a result of the Environmental Assessments, each Seller Party shall consent to and use its commercially reasonable efforts to provide the necessary access for the completion of such investigations, which may include, without limitation, testing or sampling of any air, soil, surface water or groundwater.  For the avoidance of doubt, nothing discovered during the course of such investigation shall give rise to any right of Buyer to terminate this Agreement, unless and only to the extent such discovery results in a breach of the representations and warranties set forth in <u>ARTICLE III</u> of this Agreement that is not cured in accordance with

- 29 -

Section 8.4, in which case such termination right may be effected only in accordance with ARTICLE X of this Agreement and the other provisions related to an Applicable Pre-Closing Breach.

**Section 5.3**   Efforts to Consummate; Certain Governmental Matters.

(a)   Each Seller Party shall, and Seller shall cause each of the Purchased Companies to, take all action required, without any cost or expense to, or the incurrence of any liability by, any of the Purchased Companies, such that, at the time of Closing there is no outstanding warrant, option, convertible security, incentive unit or other right or Contract in existence that gives any Person who is not a Party an equity interest, or an option to purchase or receive an equity interest, in each case whether vested or unvested, (including, without limitation, the Class B Units in Great White Pressure Control LLC) in any of the Purchased Companies.

(b)   Each Party shall, and shall cause each of its respective Subsidiaries to, use its respective reasonable best efforts to obtain and to cooperate in obtaining any Regulatory Approvals and Non-Governmental Consents required in connection with the execution, delivery or performance of this Agreement or any Ancillary Agreement, including responding as promptly as practicable to any requests for information. Without limiting the foregoing, the Parties shall, as soon as practicable, and in no event later than five (5) Business Days after the date hereof, file Notification and Report Forms under the HSR Act with the Federal Trade Commission (the "FTC") and the Antitrust Division of the Department of Justice (the "Antitrust Division") and shall use reasonable best efforts to respond as promptly as practicable to all inquiries received from the FTC or the Antitrust Division for additional information or documentation. Each of the Parties shall use reasonable best efforts to cause the waiting periods under the HSR Act to terminate or expire at the earliest possible date after the date of filing. Each Party shall use its reasonable best efforts to cooperate with the other Party in such other Party's efforts to obtain any Regulatory Approvals or Non-Governmental Consents as are required in connection with the consummation of the transactions contemplated hereby; provided, however, that, notwithstanding anything to the contrary set forth herein, in no event shall any Party be required to make any payment to such third parties or concede anything of value, other than such payments or concessions that are de minimis in nature and do not exceed $100,000 in value in the aggregate, in order to obtain any such consent, approval or waiver; provided further, however, that if any Party is required to make a payment or concession in excess of the forgoing, the other Party may, to the extent possible, elect to make a substitute payment or concession on the first Party's behalf. It is understood and agreed that "reasonable best efforts" of a Party shall not include any actions or undertakings which would reasonably be expected to result in material cost or material harm to such Party. No Party shall voluntarily extend any waiting period under the HSR Act or any Competition/Investment Law or enter into any agreement with any Governmental Entity to delay or not to consummate the transactions

- 30 -

Confidential

contemplated by this Agreement except with the prior written consent of the other Parties (such consent not to be unreasonably withheld or delayed).

(c)    Subject to the terms and conditions set forth in this Agreement, each Party shall use, and shall cause each of its Subsidiaries to use, its respective reasonable best efforts to take or cause to be taken all actions, and do or cause to be done all things, necessary, or reasonably advisable on its part under this Agreement and the Ancillary Agreements and applicable Law to satisfy the conditions to Closing, and to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as soon as practicable.

(d)    Each Party shall, upon written request by another Party and subject to appropriate confidentiality restrictions, furnish such requesting Party with all material documentation concerning the furnishing Party and such other matters as may be necessary or reasonably advisable in connection with any notices, reports, statements, applications or other filings made by or on behalf of any Party or any of their respective Affiliates to any Governmental Entity in connection with the transactions contemplated by this Agreement and the Ancillary Agreements; provided that any such documentation furnished by the Parties to one another may be redacted or withheld to the extent necessary to comply with applicable Law or to the extent such information is subject to the attorney-client privilege or any obligation of confidentiality to any third party.

(e)    Subject to applicable Law or as prohibited by any Governmental Entity, Buyer and the Seller Parties each shall keep the other apprised of the status of matters relating to consummation of the transactions contemplated hereby, including (i) promptly notifying the other of any facts, circumstances or other reason that would prevent the receipt of any Regulatory Approvals or the Non-Governmental Consents for the timely consummation of transactions contemplated by this Agreement and the Ancillary Agreements, and (ii) promptly furnishing the other with copies of material notices or other communications received by Buyer or any Seller Party, as the case may be, from any third party and/or any Governmental Entity with respect to the transactions contemplated by this Agreement and the Ancillary Agreements. No Party shall permit any of its Representatives to participate in any meeting with any Governmental Entity with respect to any filings, investigation or other inquiry relating to the transactions contemplated hereby unless it consults with the other Party in advance and, to the extent permitted by such Governmental Entity, gives the other Parties the opportunity to attend and participate thereat.

(f)    As soon as practicable, and in no event later than five (5) Business Days after the date hereof, the Parties shall prepare and file all notices, reports, statements, applications and other filings as required by applicable Law or any Governmental Entity or as otherwise customary or advisable under applicable Law as a result of the consummation on the Closing Date of the transactions contemplated hereby.

- 31 -

Confidential

(g)    Subject to applicable Law and except as required by any Governmental Entity, no Party shall take any action that would be reasonably likely to prevent or materially delay the receipt of any Regulatory Approvals or Non-Governmental Consents, in each case, to the extent necessary for the timely consummation of the transactions contemplated by this Agreement and the Ancillary Agreements.

(h)    Prior to Closing, or as soon as practicable thereafter, Buyer and Seller shall enter into a transition services agreement providing for the continuation by Seller (or one or more of its Affiliates) of the services set forth on Schedule 5.3(h) through December 31, 2011, in accordance with the principles set forth on such Schedule.

**Section 5.4**    Interim Operation Covenants of Seller and the Purchased Companies. Except (1) as required by applicable Law, (2) as otherwise expressly required by this Agreement or any Ancillary Agreement, (3) as Buyer may consent in writing, (4) for repayments, redemptions or repurchases for cash of loans or other obligations under the Credit Facility, or (5) as set forth in Schedule 5.4 of the Disclosure Schedules, during the period from the date hereof until the earlier of (x) the termination of this Agreement in accordance with its terms and (y) the Closing:

(a)    Seller shall use its reasonable best efforts to, and shall cause the Purchased Companies to, and each Purchased Company shall:

(i)    preserve, maintain and protect the material assets, properties and rights of the Purchased Companies;

(ii)    conduct its business and operations in the ordinary course consistent with past practice and maintain, in all material respects, its books, accounts and records in accordance with past custom and practice;

(iii)    maintain, in all material respects, its cash management practices and its policies, practices and procedures with respect to the collection of trade accounts receivable, establishment of reserves for uncollectible accounts, accrual of accounts receivable, inventory control, prepayment of expenses, payment of trade accounts payable, accrual of other expenses, deferral of revenue and acceptance of customer deposits in accordance with past custom and practice;

(iv)    maintain sufficient cash on hand to operate its business in the ordinary course consistent with past practices; provided that in no event shall the Purchased Companies be required to have more than $5,000,000 of cash on hand immediately prior to the Closing;

(v)    pay and discharge its debts in the ordinary course consistent with past practices;

- 32 -

Confidential

(vi)      maintain its current insurance policies in full force and effect, unless such policies are replaced with equal or greater coverage;

(vii)      use all commercially reasonable efforts to maintain and preserve its present business organization in full force and effect, retain its present employees who are in good standing and maintain its relationships with its employees, agents, distributors, licensees, suppliers and customers who are material to the businesses of the Purchased Companies taken as a whole;

(viii)      comply with all material legal requirements and material obligations under each Material Contract, in each case applicable to or binding upon it;

(ix)      maintain in full force and effect the existence of all material trademarks, service marks, trade names, corporate names, copyrights, trade secrets, licenses and other Intellectual Property Rights that are used or owned in connection with its business;

(x)      maintain all material authorizations, consents, accreditations, licenses, permits and approvals pertaining to it and its business; and

(xi)      continue to make capital expenditures pertaining to its business in the ordinary course consistent with past practice and in accordance with the capital expenditure budget for 2011 previously delivered to Buyer (the "CapEx Budget"); provided, however, that any Contract for any such capital expenditure that is between any Purchased Company and any Affiliate of Seller (other than a Purchased Company) shall be on terms, on the whole, no less favorable to such Purchased Company than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate of Seller.

(b)      Each Purchased Company shall not, and Seller shall cause each Purchased Company not to:

(i)      implement or adopt any material change in the accounting principles, practices or methods of any Purchased Company, other than as may be required by Law or applicable accounting requirements;

(ii)      (A) enter into, adopt, amend (except for such amendments as may be required by Law), renew or terminate any Benefit Plan or any other benefit plan or arrangement for the benefit of any current or former director, employee or consultant of any Purchased Company, (B) except as required by the terms of any Benefit Plan as in effect as of the date hereof, increase in any manner the compensation, bonus or fringe or other benefits of, or pay any bonus of any kind or amount whatsoever to, any current or former director, employee or consultant of any Purchased Company; provided, that (x) the Seller Parties shall be permitted to increase the salaries of any field level operating personnel in the ordinary course of business consistent with past practice and (y) no equity or equity-based grants shall be made, (C) pay any benefit or amount not required under any Benefit Plan or any other benefit plan or arrangement

- 33 -

ARCHER-00270543

for the benefit any current or former director, employee or consultant of any Purchased Company as in effect on the date of this Agreement, (D) grant or pay any severance or termination pay or increase in any manner the severance or termination pay of any current or former directors, employee or consultant of any Purchased Company, (E) grant any awards under any bonus, incentive, performance or other compensation plan or arrangement or Benefit Plan (including the grant of any equity or equity-based awards), (F) take any action to fund or in any other way secure the payment of compensation or benefits under any employee plan, agreement, contract or arrangement or Benefit Plan, (G) take any action to accelerate the vesting or payment of any compensation or benefit under any Benefit Plan or (h) adopt, approve, ratify or enter into any collective bargaining agreement side letters, memoranda of understanding or similar agreement with any labor union;

(iii)    amend its Organizational Documents;

(iv)    (A) issue any additional shares of its own capital stock or equity interests, or any options, warrants, convertible securities or other rights exercisable therefor or convertible thereinto or (B) except as contemplated in Section 5.3(a), amend in any respect any of the terms of any such interest outstanding as of the date hereof, except and solely to the extent necessary to comply with the Seller Parties' obligations under Section 5.3(a);

(v)    adopt a plan of complete or partial liquidation or authorize or effect any liquidation, dissolution, merger, consolidation, restructuring, recapitalization, reclassification, membership interest split or like change in capitalization, or other reorganization of any of the Purchased Companies;

(vi)    adjust, split, combine, redeem, reclassify, purchase or otherwise acquire, any shares of its own capital stock or equity interests, or any options, warrants, convertible securities or other rights exercisable therefor or convertible thereinto, other than any such transaction or event involving solely one or more of the Seller Parties;

(vii)    declare, set aside or pay any dividend or other distribution payable in stock or any other property or right with respect to any of its equity interests; provided that, for the avoidance of doubt, subject to Section 5.4(a)(iv) and in accordance with the other terms of this Agreement, each Purchased Company may distribute cash to Seller prior to Closing;

(viii)    make any loans, advances, or capital contributions to, or investments in, any Person other than another Purchased Company;

(ix)    incur, create, guarantee or assume any Indebtedness or otherwise become liable or responsible for the obligations of any Person other than (A) Indebtedness that will be paid on or prior to the Closing Date, (B) Indebtedness that is included in the Net Working Capital Amount or (C) Indebtedness incurred, created, guaranteed or assumed in the ordinary course of business consistent with past practice;

- 34 -

Confidential

(x)     forgive, cancel or waive any rights of material value or any debts or other material obligations owed to it;

(xi)     waive any claim or settle any Litigation; provided, however, that the Purchased Companies may (A) settle any claim or Litigation arising in the ordinary course of business that is fully covered by any Insurance Policy, except for such claims or Litigation brought by or against any Affiliate of any Seller Party; and (B) settle any claim or Litigation arising in the ordinary course of business that is not fully covered by any Insurance Policy that does not result in payments by or to any of the Purchased Companies in excess of $25,000 individually or $100,000 in the aggregate; provided, however, that no settlement may be made under this Section 5.4(b)(xi) if such settlement would: (x) result in any Purchased Company being enjoined from consummating the transactions contemplated hereby, or (y) impose any material restrictions on the conduct of business of any of the Purchased Companies;

(xii)     enter into or engage in any transaction with Seller or any of its Affiliates (other than any of the other Purchased Companies), other than (A) existing transactions and (B) transactions in which the Purchased Companies provide services in the ordinary course of business on market terms;

(xiii)     transfer, mortgage, pledge, hypothecate, or grant any security interest in, any of its material assets or properties or otherwise take any action to subject any Company Asset to any Lien (other than Permitted Liens);

(xiv)     transfer any equity interests owned by it (including, with respect to Seller, any of the Transferred Interests) or pledge, encumber, grant a security interest in or take any action, or permit any of its Affiliates to take any action, that would result in any Lien upon the Transferred Interests which is not discharged in full prior to Closing;

(xv)     acquire (by merger, consolidation, or acquisition of stock or assets or otherwise) any corporation, partnership, or other business organization or division thereof;

(xvi)     enter into any Material Contract or assign, terminate or amend, modify or change in any material respect any Material Contract, any material Lease or any material Company Permit, Seller Regulatory Approval as set forth on Schedule 3.4(a) of the Disclosure Schedules or Seller Non-Governmental Approval of a type required to be listed on a Disclosure Schedule, in each case other than in the ordinary course of business consistent with past practice;

(xvii)     (A) make, change or rescind any election relating to Taxes, (B) amend any Tax Return, (C) settle or compromise any Litigation, audit or controversy or claim relating to Taxes, (D) agree to any adjustment of any Tax attribute, (E) enter into any agreement with a Governmental Entity relating to Taxes or (F) take any affirmative action to surrender any right or claim to a refund of Taxes;

- 35 -

Confidential

(xviii)  sell or dispose of any inventory other than in the ordinary course of business consistent with past practice;

(xix)   authorize, approve or incur any capital expenditures or any obligations or liabilities in respect thereof, except for expenditures contemplated by the CapEx Budget; provided, however, that any Contract for any such capital expenditure that is between any Purchased Company and any Affiliate of Seller (other than a Purchased Company) shall be on terms, on the whole, no less favorable to such Purchased Company than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate of Seller; or

(xx)    enter into any Contract with respect to any of the foregoing.

Section 5.5    Public Disclosure; Confidentiality.

(a)    Notwithstanding anything to the contrary contained in this Agreement, except as may be required to comply with the requirements of any applicable Law or any rule or requirement of any securities exchange, from and after the date hereof, the Seller Parties and Buyer shall consult with each other before, directly or indirectly, issuing any press release or similar public announcement or communication relating to this Agreement or the transactions contemplated hereby, and no Party shall issue any such press release or similar public announcement or communication without the prior approval of the other Parties, which approval shall not be unreasonably withheld, conditioned or delayed; provided, that neither the consultation obligation nor the approval right set forth in this Section 5.5(a) shall apply to any press release or other public statement relating to any actual or contemplated litigation between the Parties to this Agreement.

(b)    From and after the date of this Agreement, each Party shall, and shall cause each of their respective Affiliates to, keep confidential (i) the terms of this Agreement and the Ancillary Agreements and the negotiations relating thereto and (ii) all confidential documents and information obtained by a Party from another Party in connection with the transactions contemplated hereby (collectively, the "Confidential Information"), in each case in accordance with the terms and conditions set forth in the Confidentiality Agreement, which Confidentiality Agreement shall remain in full force and effect up until Closing.

(c)    Seller covenants and agrees with Buyer and the Purchased Companies that:

(i)    at Closing, Buyer shall be released from its obligations under the Confidentiality Agreement;

(ii)    except (A) as may be required by Law or requested by any Governmental Entity or (B) as may be necessary or advisable in connection with (x) the performance of its or its Affiliates' obligations under this Agreement or any Ancillary Agreement or (y) the enforcement of any of its or its Affiliates' rights under this Agreement or

- 36 -

Confidential

ARCHER-00270546

any Ancillary Agreement, from and after the Closing, the confidentiality of any Confidential Information regarding the business or properties of the Purchased Companies shall be maintained by Seller and its Affiliates and their respective Representatives; and

(iii)   except (A) as may be required by Law or requested by any Governmental Entity or (B) as may be necessary or advisable in connection with (x) the performance of its or its Affiliates' obligations under this Agreement or any Ancillary Agreement or (y) the enforcement of any of its or its Affiliates' rights under this Agreement or any Ancillary Agreement, from and after Closing, neither Seller nor any of its Affiliates shall use any of the Confidential Information for any purpose.

(d)   This Section 5.5 shall survive the termination of this Agreement and the consummation of the Closing.

**Section 5.6**   Records.  As promptly as practicable following the Closing, Seller shall, and shall cause its Affiliates (other than the Purchased Companies) to, and shall use its reasonable best efforts to cause its Representatives to, transfer, assign and deliver to Buyer all original records, documents, data and files in its and their possession to the extent constituting records, documents, data or files of the Purchased Companies.

**Section 5.7**   Directors' and Officers' Exculpation; Indemnification.

(a)   Buyer agrees that all rights to indemnification for acts or omissions occurring prior to the Closing now existing in favor of the current or former directors or officers (or persons holding similar positions) of any Purchased Company currently indemnified by any Purchased Company (collectively, the "Covered Persons") as provided in their respective Organizational Documents, any indemnity or indemnification agreements disclosed in Schedule 5.7 of the Disclosure Schedules or as provided pursuant to a resolution of the board of directors (or similar governing body) of any Purchased Company, as applicable, and disclosed in Schedule 5.7 of the Disclosure Schedules shall survive the closing of transactions contemplated by this Agreement and shall continue in full force and effect in accordance with their terms as of the Closing for a period of not less than six (6) years from the Closing.  Without limiting the foregoing, for a period of not less than six (6) years from the Closing, Buyer (i) shall, and shall cause each of the Purchased Companies to, fulfill and honor in all respects the respective obligations of each Purchased Company pursuant to any of the indemnification obligations described in the immediately preceding sentence and (ii) shall not, and shall not permit any Purchased Company to, amend, modify or terminate any Organizational Document, or any such Contract or resolution in any manner that would adversely affect such indemnification rights. For the avoidance of doubt, the Parties hereby acknowledge and agree that such rights to indemnification referred to in this Section 5.7(a) do not constitute Seller Released Liabilities.

- 37 -

Confidential

ARCHER-00270547

(b)     The Seller Parties may prior to the Closing, or the Buyer shall as of the Closing, provide (or cause to be provided for, which includes the continuation of the current policy) each Covered Person with liability insurance for a period of six (6) years after the Closing Date that is no less favorable in coverage and amount than any applicable insurance in effect immediately prior to the date of this Agreement; provided, however, that (i) the Seller Parties shall not incur any cost in connection with such insurance which is greater than 250% of the per annum rate of premium currently paid by Seller and its Subsidiaries for such insurance on the date of this Agreement and (ii) if the Seller Parties do not procure such insurance prior to the Closing and if such liability insurance is not available at a cost of less than or equal to 250% of the per annum rate of premium currently paid by Seller and its Subsidiaries for such insurance on the date of this Agreement, Buyer shall purchase, or cause the Purchased Companies to purchase, as much coverage as reasonably practicable for such amount.

(c)     The provisions of this Section 5.7 are (i) intended to be for the benefit of, and shall be enforceable by, each Covered Person and each such Person's heirs, legatees, representatives, successors and assigns, it being expressly agreed that such Persons shall be third party beneficiaries of this Section 5.7, and (ii) in addition to, and not in substitution for, any other rights to indemnification or contribution that any such Person may have by Contract or otherwise.  If Buyer or its successors or assigns (i) shall consolidate with or merge into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) shall transfer all or substantially all of its properties and assets to any Person, then, and in each such case, proper provisions shall be made so that the successors and assigns of Buyer shall assume all of the obligations of Buyer set forth in this Section 5.7.

**Section 5.8**     Post-Closing Changing of Names.  Promptly following the Closing, Seller shall, and shall cause its Affiliates to, take all actions necessary to change the legal and trade names of such Persons to names that will not contain "Great White" in them. Promptly following the Closing, Buyer shall change the legal and trade names of Diamondback-Directional Drilling LLC, so that it no longer includes the word "Diamondback." Such actions by Buyer and Seller shall include filing with the appropriate Governmental Entities, such documents as are required in order to effect the name changes.  To the extent any of them have any such rights, all rights of Seller and its Affiliates, on the one hand, and Buyer, on the other hand, to use such names shall terminate at Closing.

**Section 5.9**     Withdrawal of Registration Statement.  Immediately prior to or upon the Closing, Seller shall, or shall cause the Purchased Companies to, withdraw the Registration Statement.  Seller shall not, and shall not permit any of the Purchased Companies to, issue or sell any securities under the Registration Statement unless and until, subject to Section 10.2, the Agreement is terminated in accordance with Article X.

**Section 5.10**    Notifications of Certain Matters.

- 38 -

Confidential                                                      ARCHER-00270548

(a)     During the period from the date hereof until the earlier of (i) the termination of this Agreement in accordance with its terms and (ii) the Closing, Buyer shall promptly notify Seller in writing of the occurrence or non-occurrence (as the case may be) of any event that would reasonably be expected to result in any condition to the obligations of Buyer set forth in Section 8.2 not being satisfied.

(b)     During the period from the date hereof until the earlier of (i) the termination of this Agreement in accordance with its terms and (ii) the Closing, Seller shall promptly notify Buyer in writing of the occurrence or non-occurrence (as the case may be) of any event that would reasonably be expected to result in any condition to the obligations of Seller set forth in Section 8.3 not being satisfied.

**Section 5.11**   Payment of Indebtedness.   At or prior to the Closing, Seller shall, or shall cause the Purchased Companies to, pay in full the Indebtedness set forth on Schedule 5.11 of the Disclosure Schedules.

**Section 5.12**   Notices to Escrow Agent.   Seller and Buyer shall provide the Escrow Agent with such notices, directions and instructions (as are necessary for the Escrow Agent to fulfill its obligations set forth in the Indemnity Escrow Agreement) in accordance with the provisions of this Agreement.

**Section 5.13**   Asset Transfers.   At or prior to the Closing, without the payment of any additional consideration by Buyer, Seller shall transfer and assign, or cause to be transferred and assigned, to one or more Purchased Companies designated by Buyer all of the transferor's right, title and interest in and to the assets currently owned by Seller or any of it's Affiliates (other than any of the Purchased Companies) that are used primarily by the Purchased Companies in the operation of the business of the Purchased Companies, which assets are set forth on Schedule 5.13 (provided, however, that the omission of any such asset or assets from Schedule 5.13 shall not relieve Seller of its obligations under this Section 5.13 with respect to such asset(s)).

## ARTICLE VI

## EMPLOYMENT MATTERS

**Section 6.1**   Employment.   From the period beginning at the Closing Date and continuing through December 31, 2011, Buyer shall provide, or shall cause one of its Affiliates to provide, to each active Employee base salary that is no less than the base salary as in effect immediately prior to the Closing.

- 39 -

Confidential

**Section 6.2**   <u>Employee Benefits.</u> (a)  Each Employee shall be eligible, subject to the provisions hereof, to participate in the employee benefits that are substantially comparable in the aggregate to the employee benefits provided to similarly situated employees of Buyer and its Affiliates as in effect from time to time (the "<u>Buyer Plans</u>").  If the Employees participate in the Buyer Plans, Buyer shall, or shall cause its Affiliates or the Purchased Companies to use commercially reasonable efforts to cause its third party insurance providers or third party administrators to, (i) provide coverage for Employees and their eligible dependents under its or their medical, dental and health plans without interruption of coverage; (ii) cause there to be waived any pre-existing condition, actively at work requirements and waiting periods; and (iii) cause the Buyer Plans to honor any expenses incurred by the Employees and their eligible dependents under similar Benefit Plans during the portion of the calendar year in which the Closing Date occurs for purposes of satisfying applicable deductible, co-insurance and maximum out-of-pocket expenses.  Nothing herein shall prevent Buyer, its Affiliates or the Purchased Companies from terminating the employment of any Employee in compliance with applicable Law.

(a)    In accordance with Treasury Regulation Section 54.4980B-9 Q&A 7, as of the Closing Date, Buyer will assume all liabilities for providing and administering all required notices and continuation coverage following the Closing Date under Section 4980B of the Code ("COBRA") to all Employees and their respective dependents and to all M & A Qualified Beneficiaries (as defined in Treasury Regulation Section 54.4980B-9 Q&A 4) with respect to a Seller Party.  Seller will have no COBRA liability or obligations to such Employees and their respective dependents or to such M&A Qualified Beneficiaries after the Closing Date, except as required by Law.

**Section 6.3**   <u>Credit for Service and Benefit Accrual.</u>  For purposes of eligibility, vesting and benefit accruals (other than benefit accruals under a defined benefit pension plan) under each Buyer Plan in which Employees are eligible to participate following the Closing, Buyer shall, and shall cause its Affiliates to, give each Employee credit under such plans for all service with the Seller or the Purchased Companies prior to the Closing to the same extent as such service was recognized for such purpose by the Purchased Companies and/or their Affiliates prior to the Closing; <u>provided</u>, <u>however</u>, that such service shall not be credited to the extent that it would result in a duplication of benefits.

**Section 6.4**   <u>Treatment of Seller Defined Contribution Plans.</u>  As soon as practicable following the date hereof, Buyer and Seller shall cooperate to take all necessary and appropriate action to establish a new 401(k) savings plan for the benefit of the Employees with terms substantially similar to the terms of the Great White Energy Services, LLC 401k Plan (the "Transferee Savings Plan").  Upon establishment of the Transferee Savings Plan, Seller shall take all necessary and appropriate action to cause to be transferred from the Great White Energy Services, LLC 401k Plan to the Transferee Savings Plan covering the Employees the liability for the account balances of the Employees (including outstanding loan balances of Employees who

- 40 -

Confidential

ARCHER-00270550

are participants in the Great White Energy Services, LLC 401k Plan), together with cash, cash equivalents or other mutually acceptable property, the value of which on such transfer date is equal to such liability, and Buyer and Seller shall cooperate to cause the Transferee Savings Plan to accept such transfer, all in accordance with the rules and regulations under Section 414(l) of the Code.  The Transferee Savings Plan will be sponsored by a Purchased Company as mutually determined by Seller and Buyer and will provide that individuals who are not employed by a Purchased Company as of the Closing may not be active participants in such Transferee Savings Plan.  The transfer of assets shall take place as soon as practicable following the date hereof, but within 90 days after the Closing.  Seller and Buyer shall provide each other with access to information reasonably necessary in order to carry out the provisions of this paragraph.

**Section 6.5**   <u>WARN</u>.

(a)   With respect to all employment losses experienced by the Employees and all other persons employed by Buyer which take place after the Closing, Buyer will have full responsibility and all liability under the Worker Adjustment and Retraining Notification Act, and all other similar applicable statutes, ordinances and regulations of any jurisdiction which impose advance notice or other requirements concerning any such employment losses (the "<u>WARN Act</u>").  In the event that any such employment losses are deemed to cause a plant closing, mass layoff or other event requiring advance notice or other actions by Seller and/or its Affiliates under the WARN Act (a "<u>Triggering Event</u>"), then Buyer will have full responsibility and all liability arising from any such Triggering Event, including responsibility and liability pertaining to employees of any of the Purchased Companies who were employed in connection with the business of the Purchased Companies prior to the Closing but were not Employees on or after the Closing.  For purposes of this <u>Section 6.5</u>, a Triggering Event will be deemed to have been caused by such employment losses if the Triggering Event would not have occurred but for the employment losses which take place after the Closing, and "employment loss" has the same meaning as defined in the WARN Act.

(b)   On or before the Closing Date, Seller shall provide to Buyer <u>Schedule 6.5</u>, which shall contain a true and complete list of the names and the sites of employment or facilities of those individuals who have experienced or will experience an "employment loss" (as defined in the WARN Act) at any site of employment or facility of the Purchased Companies during the 90-day period prior to and including the Closing Date.  Seller shall update this list up to and including the Closing Date.  Seller shall not, at any time ninety (90) days before the Closing Date, without complying fully with the notice requirements and other requirements of the WARN Act, effectuate (i) a plant closing as defined in the WARN Act affecting any site of employment of Seller, (ii) a mass layoff as defined in the WARN Act affecting any site of employment of Seller or (iii) any similar action under the WARN Act requiring notice to employees in the event of an employment loss or layoff.

- 41 -

Confidential

**Section 6.6**    No Amendment.  Notwithstanding any other provision of this Agreement, nothing contained in this ARTICLE VI shall (i) be deemed to be the adoption of, or an amendment to, any employee benefit plan, as that term is defined in Section 3(3) of ERISA, or otherwise limit the right of Seller, Buyer or their respective Affiliates (including the Purchased Companies), to amend, modify or terminate any such employee benefit plan or (ii) give any third party any right to enforce the provisions of this ARTICLE VI.

**Section 6.7**    Employment Agreements.  Prior to the Closing, Seller shall cause each of the employment agreements listed on Schedule 6.7 (each an "Employment Agreement") to be revised or amended, without any cost or expense to Buyer or any Purchased Company, to fully settle and release (i) any and all rights of the employee under such Employment Agreement to receive any equity interest in (or payment in respect of or determined in whole or in part by reference to the value of) the equity interest in any Person (including any Purchased Company or any of its Affiliates (including Buyer and its Affiliates), and (ii) any and all obligations under such Employment Agreement of any Purchased Company or any of its Affiliates (including Buyer and its Affiliates) in respect of any such equity interest.

ARTICLE VII

TAX MATTERS

**Section 7.1**    Tax Returns.

(a)    Seller shall file or cause to be filed when due all Tax Returns that are required to be filed by or with respect to the Purchased Companies on or before the Closing Date and shall pay any Taxes due with respect to such Tax Returns.  Seller shall prepare or cause to be prepared all Tax Returns with respect to Pre-Closing Tax Periods required to be filed after the Closing Date, and Buyer shall cause such Tax Returns to be filed. Buyer shall prepare and file or cause to be prepared and filed when due all Tax Returns that are required to be filed by or with respect to the Purchased Companies with respect to any Straddle Period.  All such Tax Returns shall be prepared in a manner consistent with past practices and applicable Law.  Each Party preparing such Tax Returns shall allow the non-preparing Party at least fifteen (15) days to review and comment on such Tax Return, and shall make such revisions as are reasonably requested by the other Party, prior to the filing of such Tax Return.  However, with respect to any Tax Return filed on a consolidated, combined, affiliated, unitary or similar basis that includes a Purchased Company and any Person other than a Purchased Company, the preceding sentence shall not apply.  At least five (5) days prior to the due date of any Tax Return with respect to a Pre-Closing Tax Period required to be filed after the Closing Date or with respect to a Straddle Period, Seller shall pay to Buyer the amount of any Taxes shown to be due thereon for which Seller is liable pursuant to Section 7.2.

- 42 -

Confidential

ARCHER-00270552

(b)   Buyer shall not, without the prior written consent of Seller, amend a Tax Return with respect to the Purchased Companies filed or required to be filed by Seller.

**Section 7.2**   Tax Indemnification.  Following the Closing Date, Seller shall indemnify, defend and hold harmless Buyer, the Purchased Companies and their respective Affiliates as provided in this Section 7.2 from and against any and all Losses of any Purchased Company, Buyer or any of their respective Affiliates attributable to any (i) breach of any representation contained in Section 3.15 or any covenant contained in this ARTICLE VII, (ii) liability for Taxes of any other Person as a result of any Purchased Company's being a member of an affiliated group prior to the Closing Date pursuant to Treasury Regulation Section 1.1502-6 or any analogous state, local or foreign tax provisions, or as a result of liability for Taxes of another Person as a successor, transferee by contract or otherwise, (iii) Taxes of any Purchased Company for any Pre-Closing Tax Period except to the extent such Taxes (or reserves therefore) were included in the Net Working Capital Amount and (iv) any Transfer Taxes for which Seller is liable pursuant to Section 7.4.

**Section 7.3**   Straddle Periods.  In the case of Taxes that are payable with respect to any Straddle Period, the portion of any such Tax that is allocable to the portion of the period ending on the Closing Date shall be: (1) in the case of Taxes imposed on a periodic basis (such as real or personal property Taxes), the amount of such Taxes for the entire period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period) multiplied by a fraction, the numerator of which is the number of calendar days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of calendar days in the entire relevant Straddle Period and (2) in the case of Taxes not described in (1) above (such as franchise Taxes, Taxes that are based upon or related to income or receipts, based upon occupancy or imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible)), the amount of any such Taxes shall be determined as if such taxable period ended as of the close of business on the Closing Date. Each of Buyer and Seller shall, to the extent permitted or required under applicable law, take all actions necessary to treat the Closing Date as the last day of the taxable year or period for all Tax purposes.

**Section 7.4**   Transfer Taxes.  All local, foreign or other excise, sales, use, value added, transfer (including real property transfer or gains), stamp, documentary, filing, recordation and other similar taxes and fees that may be imposed or assessed as a result of the execution of this Agreement or the Ancillary Agreements, together with any inflation adjustment, interest, additions or penalties with respect thereto and any inflation adjustment or interest with respect to such additions or penalties ("Transfer Taxes"), shall be borne one half by Seller and one half by Buyer.  Any Tax Returns that must be filed in connection with such Transfer Taxes shall be prepared by the Party primarily or customarily responsible under applicable local Law for filing such Tax Returns, and such Party will use its reasonable best efforts to provide such Tax Returns

- 43 -

Confidential